Matthew CAVANAGH, et al., Plaintiffs

v.

Nancy GRASMICK, et al., Defendants

Nos. CIV. AMD 98–3400,
CIV. AMD 99–543.

United States District Court,
D. Maryland.

Nov. 24, 1999.

Julie Ann Starbuck, Holly Lynn Parker, Michael J. Eig, Matthew B. Bogin, Eig, Parker & Starbuck, Washington, DC, for plaintiffs.

J. Joseph Curran, Jr., Attorney General, Dana Hendricks Murray, Assistant Attorney General, Baltimore, Andrew W. Nuss-

baum, Knight, Manzi, Nussbaum & LaPlaca, Upper Marlboro, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

These actions were brought by Martin Cavanagh in his own right and on behalf of his son, Matthew (together, the "Cavanaghs"), relying principally upon the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.*, against defendants, the Maryland State Department of Education and its Superintendent, Nancy S. Grasmick (together, "MSDE") and the Prince George's County Public Schools and its Superintendent, Jerome Clark (together, "PGCPS").[1] The Cavanaghs allege, *inter alia,* that defendants failed to provide Matthew with a "free appropriate public education" ("FAPE") for the 1997–98 and 1998–99 school years and otherwise violated IDEA in myriad respects.

The Cavanaghs filed separate actions for each of the school years at issue and the actions have been consolidated.[2] Pending before the court are MSDE's Motion to Dismiss, or in the Alternative, For Summary Judgment, and PGCPS's Motion for Summary Judgment. I have reviewed the administrative record and thoroughly examined the parties' submissions; no hearing is necessary. For the reasons discussed below, I will grant defendants' motions.

## I. FACTS

### A. Background

Matthew, now 16 years old, has a history of congenital hydrocephalus and Arnold–Chiari Malformation Syndrome.[3] He is classified as "other health impaired" and qualifies for special education services under the IDEA.[4] As a result of his condition, and although he presents socially as a normal child, his cognitive functioning falls within the mentally deficient range. He has difficulty with focusing, retaining information and with spatial and visual perception.

During the 1996–97 school year, Matthew attended seventh grade and received regular and Intensity III special education services at the Benjamin Tasker Middle School ("Tasker"), a public school within the PGCPS system.[5]

During Matthew's year at Tasker, the Cavanaghs concluded that its services were not meeting Matthew's educational

---

1. While this may generally be characterized as an IDEA case, the Cavanaghs also seek relief under the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, the Civil Rights Act, 42 U.S.C. § 1983, and the Maryland Education Act, Md.Code. Ann. §§ 8–401, *et seq.*

2. Citations to the record covering the first due process hearing, held on January 20 and 21, February 6 and 19, and March 9, 1998 are indicated as "Tr. I at [ ]." Citations to the opinion issued by Administrative Law Judge L. Kristine Hoffman on May 4, 1998, are indicated as "Opinion of ALJ Hoffman at [ ]." Citations to the record covering the second due process hearing, held on August 10, 1998, are indicated as: "Tr. II at [ ]." Citations to the opinion issued by Administrative Law Judge Anita Earp Robinson on September 2, 1998, are indicated as "Opinion of ALJ Robinson at [ ]."

3. Hydrocephalus is a condition in which water accumulates in the space between the brain and the skull causing cognitive difficul-

ties. In Matthew's case, a shunt drains the water to avoid an impairing buildup of pressure. Arnold–Chiari Malformation Syndrome is a rare congenital malformation at the base of the brain, whereby parts of the brain's structures are displaced into the spinal column, causing a variety of symptoms and disabilities. *See* Opinion of ALJ Hoffman at 11, n.1.

4. The IDEA provides special education services for "mentally retarded, hard of hearing, deaf, speech or language impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children or children with specific learning disabilities, who by reason thereof require special education and related services." 20 U.S.C. § 1401(a)(1). The parties do not dispute that Matthew has been identified as "other health impaired."

5. Prior to the revisions to COMAR effective on July 1, 1999, COMAR identified the level of special education services needed by a stu-

needs. They requested an Admission, Review and Dismissal ("ARD") meeting[6] with PGCPS to discuss accommodations to meet Matthew's educational needs and to develop an Individualized Education Plan ("IEP").[7] Between early and mid–1997, the Cavanaghs submitted Matthew to the Kennedy Kreiger Institute ("Kennedy Krieger") for evaluation and retained the services of Dr. Laura Soloman, an independent special education consultant, to assist them in identifying an appropriate program for Matthew.[8] In the course of negotiations between the Cavanaghs and PGCPS regarding Matthew's year at Tasker and Matthew's future educational placement for the upcoming 1997–98 school year, the parties reached an impasse and the Cavanaghs filed a due process hearing request.

On or about August 28, 1997, and prior to the completion of the requested due process hearing, the Cavanaghs and PGCPS reached a settlement agreement. The parties agreed that Matthew's educational needs for the 1997–98 school year could be accommodated by the special education services provided in the special education "wing" at Kettering Middle School ("Kettering"), another public school placement within the PGCPS system.[9]

Following Matthew's assignment to Kettering, but before Matthew enrolled, the

---

dent as different intensities, indicated by the number of hours of services to be provided. *See* COMAR 13A.05.01.10A (repealed and revised July 1, 1999). Intensity III services were appropriate for a student who required up to three hours of special education services per day in a maximum classroom size of 20 students per full-time special education teacher. *See* COMAR 13A.05.01.10E (repealed and revised July 1, 1999).

6. In Maryland, meetings dedicated to assess a student's special education needs and design an IEP are called "Admission, Review, and Dismissal" ("ARD") committee meetings. *See* COMAR 13A.05.01.08 & .09.

7. Evaluations of Matthew performed by his Tasker special education teachers expressed concerns regarding poor organization, inattentiveness, distractibility, difficulty following directions, and poor motivation. The evaluations also disclosed a severe deficiency in mathematics, difficulty with concentration, retention of information, and ability to work independently. The Cavanaghs expressed their concern that Matthew's skills in reading and writing, in addition to mathematics, fell far below his grade placement. *See* Parents Exhibit 5, at 2 (Evaluation of Kennedy Kreiger Institute).

8. Kennedy Kreiger, located in Baltimore near the Johns Hopkins Medical Center, is approximately 45–minutes from the Cavanagh home. The middle school program at Kennedy Kreiger, comprised of approximately 90 students, consists of a Traumatic Brain Injury ("TBI") class, four traveling and three self-contained classes for students with pervasive developmental disorders, two self-contained classes for emotionally disturbed students, and one bridge class for transitional lower and middle school students. *See* Opinion of ALJ Hoffman at 21. The Cavanaghs have repeatedly expressed particular interest in the appropriateness of the TBI class for Matthew.

9. The special education "wing" at Kettering Middle School, a PGCPS magnet school for communications and academics, provides Intensity levels I through V special education services. The "wing" is not actually an attachment to the school but is an integral part of it. *See* Opinion of ALJ Hoffman at 12. The eight classrooms in the wing include six "self-contained" special education classes. The self-contained classes—in which each student is taught at his or her own instructional level, as dictated by his or her IEP—are comprised of an average of between 12 and 14 students; instruction is provided by a special education teacher, a teacher's assistant, and where called for by the IEP, as in Matthew's case, aides assigned to individual students. In addition, the wing provides two Community–Referenced Instr uction/Community-Based Instruction ("CRI/CBI") classes. CRI includes in-class functional vocational life skills instruction that provides students requiring special education services with functional, as opposed to abstract skills and knowledge that can be immediately learned and applied in day-to-day settings outside of the school. *See* Tr. I at 431; Opinion of ALJ Hoffman at 12–13. CBI utilizes and reinforces the CRI in-class lessons through weekly field trips to, for example, the supermarket to buy items and correctly calculate prices and money combinations required, to the drugstore to request prescriptions, or to the library to check out books and apply for a library card. In addition to self-contained, CRI and CBI classes, the wing provides physical, occupational and speech therapy, as well as vision, hearing and

Cavanaghs took a tour of the school. Undoubtedly, they were impressed with the understanding that the Kettering program included functional life skills instruction combined with intensive one-on-one instruction for Matthew with a personal aide.[10]

### B. The 1997–98 School Year

#### 1. The September 11 IEP

Matthew started eighth grade at Kettering on September 2, 1997. Shortly thereafter, on September 11, 1997, the Kettering ARD team met to develop an IEP for Matthew.[11] Dr. Soloman attended the meeting with Mrs. Cavanagh. Mr. Cavanagh, who was out of town at the time, did not attend. Based on her own evaluation of Matthew, Dr. Soloman, on behalf of the Cavanaghs, submitted for consideration by the ARD team her proposals regarding the appropriate reading, math, written language, functional life, self-help,

organizational, business and services skills objectives for Matthew for the 1997–98 school year. To meet these objectives, Dr. Soloman suggested a functionally- and vocationally-oriented program. In addition, Mrs. Cavanagh expressed her concern at the meeting that the IEP should emphasize the development and reinforcement of Matthew's reading skills.[12] Incorporating some of the suggestions made by Dr. Soloman and Mrs. Cavanagh, the ARD team developed an IEP for Matthew that provided for Intensity IV special education services at Kettering.

Matthew's IEP articulated eight annual goals, each consistent with the Cavanaghs' and PGCPS' mutual conclusion that a functional vocational educational program would meet Matthew's educational needs.[13] The annual goals were to be achieved through 56 enumerated objectives and measured by, for the most part, teacher-made tests, record-keeping and review of Matthew's work samples. Matthew's IEP was to be executed during 27.5 hours of

---

mobility services to students according to the hours allocated on a student's IEP. *See* Opinion of ALJ Hoffman at 12.

**10.** Mrs. Cavanagh expressed that her "understanding was the Kettering ... had a program which would certainly help Matthew develop his functional skills in reading, arithmetic and writing. In addition, it had a program which would help him develop in the functional living survival areas." Tr. I at 631. Further, she understood that "the work with [Matthew] would be especially emphasized in the area of reading, in addition to organization and living skills, and this meant that the— there would be an aide who would be with him all the time reinforcing what his special ed teachers presented ...." *Id.* at 632. Mrs. Cavanagh also understood that "part of the resource he was to get at Kettering ... was for developing the functional living, survival area." *Id.* at 648. Mr. Cavanagh was under the same impression, i.e., that Kettering, "based on Ms. Ogden, had a program ... [that could] provide an aide for Matthew." Tr. I at 156.

**11.** In attendance from PGCPS and Kettering were Katherine Ogden, Special Education Wing Coordinator, Susan Hollingshead, School Psychologist, Carol Pickney, Health Supervisor, Gwendolyn Mason, Special Edu-

cation Officer for Compliance and Due Process, Yvonne McMullen, Special Education Teacher, Leah McKetty, Occupational Therapist, Vivian Powers and Leonard Terry, CRI Instructors. *See* PGCPS Exhibit 5 (ARD Summary Notice, September 11, 1997).

**12.** Prior to the September 11, 1997, completion of Matthew's IEP, Mrs. Cavanagh expressed her concern about developing Matthew's reading skills when she accompanied Matthew to school on his first day at Kettering, on September 2, 1997. When introduced to Matthew's temporary aide, Ms. Sweeney, and Matthew's Special Education Teacher, Ms. McMullen, Mrs. Cavanagh explained "about Matthew's needs ... [and] emphasized the reading part .... [As she] talked to Ms. Sweeney, it really was the emphasis on reading and being organized and focusing on his particular needs." Tr. I at 634–35.

**13.** The annual goals included: (1) improving functional reading skills; (2) improving functional math skills; (3) improving written language skills; (4) exploring and experiencing community-based places of finance, business and services; (5) improving organizational skills; (6) improving his ability to manage his own medical needs; (7) improving oral language skills; and (8) improving attending skills. *See* PGCPS Exhibit 1, at 8–9(IEP).

special education instruction in the Kettering wing, to be divided between CRI/CBI functional vocational classes and self-contained academic classes in Reading, Math, Science, English and Social Studies. The IEP did not allocate the 27.5 hours between CRI/CBI classes and self-contained classes with any particularity. Itinerant special education services, such as occupational and psychological therapy, were to be furnished on a consultation basis. The IEP also provided for a full-time aide to assist Matthew with organization and recording of assignments.

To supplement Matthew's special education services and to provide the least restrictive environment, the IEP also provided for 3.5 hours of regular education, which included interaction with non-disabled peers in Physical Education and Creative Arts classes. The subjects covered by the Creative Arts class—Art, Power Math, Drama and Music—changed on a quarterly basis. In addition to regular classes, Matthew's IEP provided for interaction with non-disabled peers during meals, assemblies, special events, recreational activities, student clubs, field trips and locker assignments. The IEP, which was agreed to by the Cavanaghs,[14] called for a 45 day review.

### 2. The November 5 IEP Review

#### a. Concerns raised by the Cavanaghs

On November 5, 1997, the ARD reconvened for its scheduled 45 day review to assess Matthew's progress at Kettering, to make any needed adjustments to Matthew's IEP and to take up any issues raised by the Cavanaghs and Dr. Soloman. What can be distilled from the record is that during Matthew's first four weeks or so at Kettering, the following concerns were brought to light by the Cavanaghs: (1) that Matthew required more reading time;[15] (2) that the functional vocational lessons in the CRI class were below Matthew's abilities;[16] and (3) that the CBI

14. Mrs. Cavanagh attended the meeting with Dr. Soloman. Mr. Cavanagh was absent. Dr. Soloman testified that there was an understanding that the IEP was agreed upon and would be signed by the parents following the meeting. See Tr. I at 729 ("[T]here was verbal approval of the—parental approval of the IEP and that a final copy was going to go home to the Cavanaghs for their signature."). The fact that the parents approved the September 11 IEP is not in dispute.

15. After observing Matthew's progress at home during the approximately four weeks following his enrollment at Kettering, the Cavanaghs informed PGCPS by letter dated October 8, 1997, that they were concerned that the IEP's mixture of CRI/CBI functional vocational classes with the self-contained academic classes did not allow sufficient time for Matthew to concentrate on relearning the basics—reading, writing and arithmetic. They noted that Matthew was still having difficulty recognizing words with more than four letters and with sounding out vowels. See PGCPS Exhibit 6. The letter was acknowledged by PGCPS on October 16, 1997; PGCPS Exhibit 7; see also Tr. I at 799 ("[T]here was a lot of discussion about reading concerns for Matthew [at the November meeting].").

16. On October 29, 1997, Dr. Soloman observed Matthew during English class and during a CRI class. See Tr. I at 731–37. At the subsequent November 5 ARD meeting, with respect to the CRI class, Dr. Soloman renewed her concern, raised at the September 11 meeting, that Matthew required vocational functional instruction. The instruction provided during CRI, she felt, while substantively appropriate in that it provided functional vocational instruction, was below Matthew's ability. See Tr. I at 355. Relative to Matthew, Dr. Soloman observed generally lower levels of learning ability among the CRI students. Her conclusion that the CRI class was not appropriate for Matthew, based solely on her observation of Matthew's performance during CRI class on October 29, 1997, is in part inconsistent with her testimony. The lesson observed by Dr. Soloman consisted of individual students, at the prompting of the teacher, reading vocabulary words printed on five-by-eight flash cards, naming the item—in this lesson, they were types of foods—and then either answering a question about the item or using the word in a sentence. Dr. Soloman's testimony disclosed that she observed Matthew commit a number of errors during a CRI lesson, including mistaking the word "carrots" for "crackers," not knowing what food group to which "noodles" belonged, and not knowing how to read the words "tomato" or "sausage." When Matthew was able to correctly read the word printed on the flash card, generally, he re-

field trips (i) conflicted with Matthew's reading time on Tuesdays, and (ii) combined with CRI, were generally repetitive and redundant in view of Matthew's abilities.[17]

b. Modifications suggested by the Cavanaghs

To address their concern about improving Matthew's reading ability, the Cavanaghs proposed adjusting Matthew's schedule to include a substantial period of time each day for interaction with his aide for the purpose of concentrating intensely on basic reading and to help Matthew develop a reading strategy. *See* PGCPS Exhibit 6. Strengthening Matthew's reading skills, the Cavanaghs hoped, would facilitate the improvement of Matthew's writing and mathematics skills. *See id.* To address their concern that the instruction provided in the CRI setting appeared to be below Matthew's ability, Dr. Soloman concluded following her October 29, 1997, observation of CRI class that Matthew would be better served by tailoring the CRI lessons to his level by grouping him with two or three of the similarly-functioning youngsters. *See* Tr. I at 765–66. To address the concern that the CBI class conflicted with Reading class and was at times overly repetitive, the Cavanaghs made no specific proposal, yet both the Cavanaghs and PGCPS affirmed their belief that a

functional and vocational instruction program was consistent with Matthew's needs. *See* Tr. I at 642; *id.* at 768–69 ("The team made it very clear that Matthew could continue to go on the CBI field trips.") (testimony of Dr. Soloman).

c. The November 5 Modifications

To accommodate the Cavanaghs' concern that Matthew required more concentrated instruction in reading, the ARD team added another reading objective to Matthew's IEP.[18] To accommodate the Cavanaghs' concern that the CRI instruction was below Matthew's ability, the ARD team made adjustments by removing CRI from Matthew's schedule, and placing in its stead a self-contained Science and Health class that was part of the wing. *See* Tr. I at 647; *id.* at 762; *compare* Parents Exhibit 13 (Schedule, Matthew Cavanagh), *with* Parents Exhibit 17 (Proposed Non–CRI Schedule, Matthew Cavanagh). To accommodate the Cavanaghs' concern about the conflict between CBI and Matthew's Reading class and the repetitive nature of the field trips, the IEP was also modified to allow Matthew to attend CBI field trips only when the parents believed Matthew could benefit from the trip.[19]

While Matthew's schedule was modified at the November 5 meeting, on the whole,

sponded to the questions correctly. *See* Tr. I at 735–37.

**17.** Mrs. Cavanagh testified that when she looked at the schedule of field trips planned for the CBI classes, she noted that the students frequently go several times to the drugstore or the supermarket, *see* Tr. I at 642; PGCPS Exhibit 6, and that since the CBI field trips conflicted with Matthew's reading class, given a choice, as suggested by Ms. McMullen in response to her October 8 letter, she preferred that Matthew attend reading class. *See* Tr. I at 642–43; *id.* at 768–69.

**18.** The reading objective that was added at the November 5 meeting had been rejected during the September 11 meeting. *See* Tr. I at 779; *id.* at 799; *id.* at 760–61. In its revised form, under Annual Goal Number 1, Objective 1J, it read: "Matthew will be able to decode the vocabulary words given predict-

able word families and patterns with 80% accuracy." PGCPS Exhibit 1, at 3(IEP).

**19.** The practice developed by the CRI/CBI instructors was to send home a calendar of the upcoming month's weekly field trips. *See* Tr. I at 112; Parent Exhibit 6. In Matthew's case, following the November 5 meeting, effective on November 10, 1997, the IEP called for consent to be provided by the parents if they wished him to attend a particular field trip. If the parents did not inform the instructors that they wished Matthew to attend a particular field trip, Matthew would remain in his self-contained academic classes. By virtue of some misunderstanding as to the mechanics of this arrangement, Matthew attended a limited number of field trips following the November 5 meeting.

the addition of the reading objective and the curtailment of Matthew's participation in CRI/CBI did not affect the IEP's distribution of hours between special and regular education classes. Furthermore, with the exception of the additional reading goal approved by all parties, Matthew's IEP goals remained the same. The itinerant services Matthew received were not changed.

d. Additional concerns raised by the Cavanaghs regarding Matthew's revised schedule

Matthew's new schedule was to take effect on Monday, November 10, 1997. The Cavanaghs, not satisfied with these changes, expressed additional objections which, depending on one's perspective, can be viewed on the one hand as contradictory and specious or, on the other hand, as subtle and refined. The first objection to the revised scheduled raised by the Cavanaghs appears to target the transfer of Matthew from the CRI class in the wing to a self-contained Science and Health class. In particular, given that the CRI classes in combination with the CBI field trips were specifically geared towards meeting Matthew's IEP annual goal four, which provided that Matthew would "explore and experience community-based places of finance, business and science," PGCPS Exhibit 1, at 8, the Cavanaghs wished to know how this goal and its enumerated objectives were to be accomplished under the new schedule.[20] They also raised the issue of reinforcement of lessons learned on CBI field trips, presumably when Matthew was allowed to go, in the absence of CRI classes.

3. The First Request for a Due Process Hearing

At the conclusion of the November 5 meeting, Dr. Soloman[21] stated on behalf of herself and the Cavanaghs that they did not believe that the program as implemented on September 11 and as adjusted on November 5 was appropriate for Matthew. The Cavanaghs, she informed the ARD team, would like Matthew's placement referred to the Inter–County Admission, Review and Dismissal ("ICARD") team to consider referring Matthew to Kennedy Kreiger. The ARD team responded when polled that they still believed that Matthew was receiving and would continue to receive educational benefit from the Kettering wing services and that the proposed modifications to Matthew's schedule would be implemented. In response to the objection by the Cavanaghs that they did not consent, the ARD team responded that since this was not Matthew's first IEP, the Cavanaghs' consent was not necessary, and the changes would be made over their objection.

Contending that Matthew's special educational placement had been changed without their consent, and accepting that the ARD team did not intend to send Matthew's case to ICARD, on November 6, 1997, the Cavanaghs formally requested that PGCPS refer Matthew for placement at the Kennedy Kreiger Institute. When no such referral was forthcoming, they filed a due process hearing request on December 19, 1997.

4. The First Due Process Hearing

Over the course of an extensive five-day due process hearing,[21] the Cavanaghs pros-

---

**20.** Mrs. Cavanagh testified that she was "shocked [upon learning that Matthew would be removed from the CRI classes] because . . . one of the big reasons for him being assigned to Kettering was to be provided with substantial—you know, the substantive functional living, survival skills instruction that he would have gotten out of the CRI." Tr. I at 644. Dr. Soloman testified that at the November 5 meeting, while Matthew's Special Education Teacher, Ms. McMullen, acknowledged that she could assume the responsibilities of two of the eight enumerated objectives under an-

nual goal four and suggested that at least two of the objectives be transferred to the parents' area of responsibility, the accomplishment of the remaining four objectives enumerated under annual goal four were not specifically accounted for in the revised non-CRI schedule. *See* Tr. I at 766–68.

**21.** The due process hearing was held on January 20 and 21, February 6 and 19, and March 9, 1998. The Cavanaghs entered 18 exhibits into evidence; PGCPSS entered 10 exhibits into evidence. The parties presented testimo-

ecuted alleged procedural and substantive violations of the IDEA. Specifically, the Cavanaghs sought to prove that PGCPS procedurally violated the IDEA because (1) Matthew was educated (a) by uncertified special education teachers, (b) in class sizes that exceeded COMAR requirements; and (2) PGCPS changed Matthew's special educational placement on November 5, 1997, without their consent. In addition, the Cavanaghs sought to prove that PGCPS substantively violated the IDEA by failing to provide him with FAPE.

In a thorough 46–page opinion issued on May 4, 1998, ALJ Hoffman found that PGCPS had complied with the procedural requirements of the IDEA and further, even assuming a procedural violation had been proved, that the Cavanaghs had not proved that the procedural violations affected the provision of FAPE. In addition, ALJ Hoffman found and concluded that PGCPS did not "change" (within the contemplation of IDEA) Matthew's special education placement following the November 5, 1997, ARD meeting; and that, ultimately, PGCPS provided Matthew with FAPE for the 1997–98 school year.

The Cavanaghs then brought this action. In addition to the denial of FAPE based on the reasons litigated before ALJ Hoffman, the Cavanaghs allege that they were denied statutory due process in violation of IDEA by virtue of (1) alleged factual and legal errors committed by ALJ Hoffman, specifically that ALJ Hoffman erred in failing to find that PGCPS in fact changed Matthew's special education placement without their consent; (2) alleged lack of impartiality on the part of ALJ Hoffman; and (3) alleged incompetence and lack of training on the part of ALJ Hoffman in the area of special education law.

### C. The 1998–99 School Year

#### 1. The June 24, 1998 ARD meeting

Following ALJ Hoffman's rejection of the Cavanaghs' claims regarding the 1997–98 school year, the Cavanaghs and PGCPS convened another ARD meeting on June 24, 1998, to discuss Matthew's future educational placement. The parties agreed that Matthew's special education needs could only be met by a nonpublic special education placement. PGCPS indicated that it would refer Matthew to the School for Contemporary Education ("SCE") and the Harbour School ("Harbour"). The Cavanaghs acceded to these referrals but insisted, again, that they would prefer that Matthew be placed at Kennedy Kreiger. On the basis of its belief that Kennedy Kreieger did not have a high school program, PGCPS did not refer Matthew to Kennedy Kreiger. In response to PGCPS' referral, SCE responded that it would not be an appropriate placement for Matthew. Harbour responded that although it would be an appropriate placement for Matthew, it could not accept him for the 1998–99 school year because doing so would have a negative impact on its overall student-teacher ratio.

#### 2. The Second Request for a Due Process Hearing

With no placement apparent for the upcoming school year, the Cavanaghs filed a due process hearing request on July 17, 1998. In the meantime, PGCPS and Harbour concluded negotiations respecting Matthew's placement: in exchange for Harbour's acceptance of Matthew for the 1998–99 school year, PGCPS agreed, on or about July 31, 1998, to fund an assistant teacher position to compensate for the impact the admission of Matthew would have on the school's student-teacher ratio. The parties disagree as to when the Cavanaghs were notified of Harbour's acceptance of the arrangement for Matthew's 1998–99 school year.

#### 3. The Second Due Process Hearing

The due process hearing scheduled for August 10, 1998 was convened. As a preliminary matter, PGCPS moved to dismiss the request for a hearing as moot, since the *raison d'etre* of the hearing—resolving

---

ny from 12 witnesses. *See* Opinion of ALJ Hoffman at 3–11.

Matthew's 1998–99 special education placement—had been obviated by Harbour's acceptance of Matthew, which had been induced by PGCPS's agreement to fund an assistant teacher at Harbour. In the face of bickering between the attorneys for the parties over the need for a hearing, and to permit counsel to confirm the details of the arrangement, ALJ Robinson recessed the hearing so the parties could call Harbour's Director.

Thereafter, on the record, the parties confirmed the arrangement agreed upon between Harbour and PGCPS. The Cavanaghs requested the ALJ to enter a "consent decree" to memorialize the terms of the arrangement, which arguably would have had the desirable effect of bestowing "prevailing party" status upon the Cavanaghs, thereby enabling them to seek attorney's fees. PGCPS objected and insisted that the request for a hearing should be withdrawn by the Cavanaghs or dismissed by the ALJ.

The ALJ took the issue under advisement and ultimately, in a written order, refused to enter a "consent decree" or similar order, relying on (1) PGCPS's *lack of consent* to such order, which was in turn based on its contention that the arrangements with Harbour had been made through the normal ARD process and *prior to the hearing*, and (2) the ALJ's uncertainty whether she possessed the authority to enter a consent decree.

Thus, ALJ Robinson granted PGCPS's motion to dismiss the proceedings as moot. The Cavanaghs then brought an appeal to this court, which was consolidated with the earlier case relating to the 1997–98 school year. With respect to the 1998–99 school year, although the Cavanaghs do not find fault with Matthew's placement at Harbour, they allege that they were denied due process when the ALJ failed to enter a consent decree, which had the effect of denying the Cavanaghs an opportunity to recover attorney's fees.

## III. THE IDEA STATUTORY FRAMEWORK

The IDEA was drafted to "assure that all handicapped children have available to them … a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). The "centerpiece" of this "free appropriate public education" is the individualized education program ("IEP") which is a collaboratively developed plan for a disabled child's education. *See Reusch v. Fountain,* 872 F.Supp. 1421, 1426 (D.Md.1994). "The IEP is supposed to be the joint product of discussions among the child's parents, teachers, and local school officials and must specify goals and short-term objectives for the child, any related services, and the criteria and evaluation procedures that will be used." *Sanger v. Montgomery County Bd. of Educ.,* 916 F.Supp. 518, 519 (D.Md.1996) (*citing* 20 U.S.C. § 1401(a)(20)(a)-(f); COMAR 13.-A.05.01.09). This written plan must be appropriately reviewed and revised. *See* 20 U.S.C. § 1414(a)(5).

The IDEA mandates that all disabled children are entitled to a FAPE. *See Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The Supreme Court has not set forth a precise formula for determining what constitutes a FAPE. More generally, it has stated that the child must receive "access to specialized instruction and related services that are individually designed to provide educational benefit." *Rowley,* 458 U.S. at 201, 102 S.Ct. 3034. Moreover, although a school system is not required to *maximize* a child's potential, *see id.* at 189, 102 S.Ct. 3034, it is imperative that the educational placement "be likely to produce progress, not regression or trivial educational advance." *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 636 (4th Cir.1985), *cited with approval in Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238, 247(3rd Cir.1999)(reiterating earlier

holding that "IDEA 'calls for more than a trivial educational benefit' and requires a satisfactory IEP to provide 'significant learning,' . . . and confer 'meaningful benefit.'") (citations omitted).

In addition, the IDEA confers upon a federal court power to "grant such relief as [it] determines is appropriate," 20 U.S.C. § 1415(e)(2), including, *inter alia,* an award of "compensatory education," equitable relief and attorney's fees to a prevailing party, all of which the Cavanaghs seek here. *See generally School Comm. of Burlington v. Department of Educ.,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

## IV. STANDARD OF REVIEW

■ Upon filing a complaint in district court requesting review of the factual findings and legal conclusions of a state administrative law judge, IDEA litigants become subject to the Rules of Civil Procedure applicable in ordinary civil litigation in federal district courts. Specifically, because this matter is pending before me on Rule 56 motions for summary judgment, the well-settled principles of summary judgment therefore also apply. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Nevertheless, what in other cases is traditionally understood as a Rule 56 motion for summary judgment may more aptly be described, in the IDEA context, where the district court is required to conduct a de novo review of the administrative record while giving "due weight" to the administrative findings made below, *see Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100, 103 (4th Cir. 1991), *aff'd,* 39 F.3d 1176 (4th Cir.1994), as a motion for "summary adjudication."

■ More particularly, to determine whether a school board has complied with the provisions of the IDEA, a court must follow the two step inquiry set forth in *Rowley. See* 458 U.S. at 206, 102 S.Ct. 3034. First, the court must determine if "the State complied with the procedures set forth in the Act." *Id.* Second, the court must evaluate whether "the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *Id.* at 207, 102 S.Ct. 3034. The burden of proof of establishing a violation of the IDEA falls on the party challenging the administrative findings, *see Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir.1991), *cert. denied,* 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *King v. Board of Educ. of Allegany County,* 999 F.Supp. 750, 766 (D.Md.1998), here the Cavanaghs.

■■ In conducting these inquiries, a court must not "substitute [its] own notions of sound educational policy for those of the school authorities." *Hartmann v. Loudoun County Bd. of Educ.,* 118 F.3d 996, 999 (4th Cir.1997), *cert. denied,* 522 U.S. 1046, 118 S.Ct. 688, 139 L.Ed.2d 634 (1998). Rather, as noted above, a federal district court must make a bounded independent decision based on the preponderance of the evidence, giving "due weight" to the state proceedings. *See Doyle,* 953 F.2d at 103. If the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct. *See id.* If the court chooses not to follow the administrative findings, it must explain its departure. *See Gerstmyer v. Howard County Pub. Sch.,* 850 F.Supp. 361, 364 (D.Md.1994).

## V. ANALYSIS

I shall first discuss the plaintiffs' claims against the state defendants, focusing principally upon the alleged procedural irregularities inherent in Maryland's statutory scheme for the vindication of rights protected by IDEA. Thereafter, I shall turn to the issues raised by the plaintiffs as to the local defendants. As will be made clear, I am not persuaded that the presumptively correct determinations of the ALJs under review should be upset.

## A. Claims Against MSDE

The principal claims against MSDE are procedural claims, which shall be discussed in detail. To the extent that the Cavanaghs seek to charge MSDE with substantive violations of IDEA, discussion of those issues is provided in connection with plaintiffs' claims against the local defendants.

### 1. Procedural Violations

Since the Cavanaghs allege procedural violations under the IDEA, I must embark upon an analysis under the first prong of *Rowley*. The first step in the *Rowley* inquiry is to determine whether the Cavanaghs have succeeded in generating a genuine issue of material fact sufficient to upset the presumptively correct determination of the state ALJ regarding whether MSDE has complied with the procedures set forth in the IDEA. *See Rowley*, 458 U.S. at 206, 102 S.Ct. 3034.

Since MSDE was not a party to the proceedings before ALJs Hoffman and Robinson, the source of the Cavanaghs' discontent with MSDE is found only in the complaints filed in these actions. As therein alleged, the Cavanaghs allege against MSDE three procedural violations. They allege MSDE violated the IDEA by:

(1) failing to provide adequate due process procedures; (2) appointing ALJs who were not impartial; and (3) failing to appoint properly trained and competent ALJs.[22] As explicated below, these allegations lack merit.

### a. MSDE Provided the Cavanaghs with Statutory Due Process

### i. The Cavanaghs have failed to raise a serious question as to the adequacy and fairness of the procedures had below

The Cavanaghs assert that summary judgment is inappropirate because a genuine issue of material fact exists by virtue of an alleged "failure of defendants to *provide* plaintiffs with adequate due process procedures, including a hearing before a knowledgeable, competent impartial hearing officer." 1998 Amended Complaint (Count III) (emphasis added); 1999 Complaint (Count II). This claim is one that the law firm representing the Cavanaghs has regularly raised in cases in this court; it is to be contrasted with a claim that the injury suffered in the administrative proceeding is the failure to *follow* the procedures set forth in the provisions of the IDEA.

---

**22.** In the two separate complaints giving rise to these consolidated actions, the Cavanaghs enumerate two counts alleging procedural violations committed by MSDE. In the 1998 complaint, as amended, the Cavanaghs allege in Count III: "The failure of defendants to provide plaintiffs with adequate due process procedures, including a hearing before a knowledgeable, competent impartial hearing officer violates IDEA, Section 504, Section 1983, and Maryland law"; and, in Count VIII (misnumbered as additional "Count VII"): "The defendants' failure to provide adequate training to the ALJ violates the IDEA, Section 504, Section 1983, and Maryland law." Amended Complaint, filed December 31, 1998, in Case No. AMD 98–3400 ("the 1998 Amended Complaint"). In the 1999 complaint, the Cavanaghs allege in Count II: "The failure of defendants to provide plaintiffs with adequate due process procedures, including a hearing before a knowledgeable, competent [sic] impartial hearing officer, vio-

lates the IDEA, Section 504, Section 1983, and Maryland law." Complaint, filed February 25, 1999, in case No. AMD 99–543 ("the 1999 Complaint").

The Cavanaghs also enumerate three counts alleging procedural violations not committed directly by MSDE, but, they assert, are attributable to MSDE under the theory that the ALJ acts as its "designee." In the 1998 complaint, the Cavanaghs allege in Count II: "ALJ committed error by failing to admit relevant, probative and admissible evidence and testimony offered by plaintiffs"; in Count V: "The failure of the ALJ to order defendants to place and fund Matthew at the Kennedy Kreiger Institute violates the IDEA, Section 504, Section 1983 and Maryland law"; and, in Count VI: "The failure of the ALJ to hear testimony and receive evidence pertinent to the issues violates the IDEA, Section 504, Section 1983, Maryland law, and the Fifth and Fourteenth Amendments to the United States Constitution."

■ Unquestionably, where there is a denial of FAPE, and where the procedural requirements of the IDEA are not followed, a state educational agency ("SEA") may incur liability, as determined by the district court's discretionary determination of the SEA's share in the responsibility for the denial of FAPE. *See Gadsby v. Grasmick*, 109 F.3d 940, 944 (4th Cir.1997)(acknowledging potential state liability where SEA fails to comply with IDEA notice provisions). Given the fact, however, that in order to be eligible for IDEA funds an SEA must demonstrate to the satisfaction of the Secretary of Education the institution of policies and procedures to ensure that it meets the due process requirements of 20 U.S.C. § 1415, *see Rowley*, 458 U.S. at 182–84, 102 S.Ct. 3034; *see also* 20 U.S.C. § 1412(a)(6)(A), and since MSDE has established such procedures to the satisfaction of the Secretary, the Cavanaghs have the significant burden of showing how the procedures implemented by MSDE are inadequate. They have utterly failed to do so in this case.

■ The IDEA allocates specific procedural responsibilities to the SEA. *See generally* 20 U.S.C. § 1415(a)-(i). In particular, under the IDEA, the SEA must establish and maintain a "comprehensive set of procedural safeguards to ensure the parents have an opportunity to contest" the decisions of the local educational agency ("LEA"). *See Gadsby*, 109 F.3d at 944 (citing 20 U.S.C. § 1415(a)). MSDE aspires to satisfy its IDEA responsibilities under the procedures set forth in Title 8 of the Education Article of the Maryland Code Annotated and Title 13A of the Code of Maryland Regulations, wherein a battery of procedural safeguards have been enacted.

For example, whenever an LEA proposes or refuses to initiate or change the student's identification, evaluation or educational placement, or the provision of FAPE to the student, Maryland law requires that prior written notice be given to the parents explaining the action proposed or refused, *see* COMAR 13A.05.01.12(B)(1)(1999); why the LEA proposes or refuses to take the action, *see id.* at 13A.05.01.12(B)(2); the options the LEA considered and the reasons why they were rejected, *see id.* at 13A.05.01.12(B)(3); each assessment procedure, test, record, or report the LEA uses as a basis for the proposal or refusal, *see id.* at 13A.05.01.12(B)(4); and any other factors relevant to the proposal or refusal, *see id.* at 13A.05.01.12(B)(5). There must be included in the written notice provisions an explanation that the parents have procedural protections and an explanation of how to obtain a copy of those safeguards. *See id.* at 13A.05.01.12(B)(6).

The procedural safeguards of which parents are apprised generally provide for "Impartial Due Process," in which "a parent ... has the right to initiate a hearing when there is a dispute about the identification, evaluation, or educational placement, or the provision of FAPE to a student with a disability ...." COMAR 13A.05.01.15(C)(1); *see also* Md.Code Ann., Educ. § 8–413(C) (Michie 1995). Parents must be informed of free and low cost legal and other relevant services, COMAR 13A.05.01.15(C)(4); *see also* Md.Code Ann., Educ. § 8–413(c)(3). Further, Maryland law provides for a "qualified impartial hearing officer to conduct a due process hearing." COMAR 13A.05.01.15(C)(5).

At the hearing itself, parents enjoy the panoply of rights afforded all litigants appearing before the state Office of Administrative Hearings. *See* Md.Code Ann. Educ. at § 8–413(d)(1) (providing for application of Rules of Administrative Procedure to hearings initiated by parents regarding a dispute about the identification, evaluation, or educational placement, or the provision of FAPE to a student with a disability); COMAR 13A.05.01.15(C)(5) (same); *see generally id.* at 28.02.01–.24 (Maryland Rules of Administrative Procedure). In addition to the procedural protections furnished in the administrative code, Maryland law specifically enumerates a host of rights intended to ensure

due process in the special education context. At the hearing, which is to be a public hearing, *see* COMAR 13A.05.01.15(C)(12)(b)(tracking procedural protections required by 20 U.S.C. § 1415(a)-(i) and 34 C.F.R. §§ 300.503–.512); *see also* Md.Code Ann., Educ. § 8–413(e)(2(ii) (same), the parents are furnished the right to be accompanied by counsel and the right to present state-funded testimony from impartial expert witnesses in the diagnosis or education of disabled testimony funded by the state, *see* COMAR at 13A.05.01.15(C)(10)(a); *see also* Md.Code Ann., Educ. § 8–413(d)(1)(iv); the right to have the subject child present at the hearing, COMAR 13A.05.01.15(C)(12)(a); *see also* Md.Code Ann., Educ. § 8–413(e)(2)(i); the right to present sworn and relevant testimony, *see* Md.Code Ann., Educ. §§ 8–413(d)(1)(iii), (v); the right to present evidence, confront, cross-examine and compel the attendance of witnesses, *see* COMAR 13A.05.01.15(C)(10)(b); *see also* Md.Code Ann., Educ. § 8–413(e)(1)(ii); the right to prohibit the introduction of evidence not previously disclosed, *see* COMAR 13A.05.01.15(C)(10)(c); *see also* Md.Code Ann., Educ. § 8–413(e)(1)(iii); the right to written findings of fact and decisions, *see* COMAR 13A.05.01.15(C)(10)(d); *see also* Md.Code Ann., Educ. § 8–413(e)(1)(v); and the right to a written or electronic verbatim record of the hearing, *see* COMAR 13A.05.01.15(C)(11); *see also* Md. Code Ann., Educ. § 8–413(e)(1)(ii).

At the conclusion of the hearing, the parents are entitled to a "written decision not later than 45 days after the receipt of the request for a hearing ...." COMAR at 13A.05.01.15(C)(6); *see also* Md.Code Ann., Educ. § 8–413(f), and the right to challenge the result in state or federal court pursuant to 20 U.S.C. § 1415(i)(2). *See* COMAR 13A.05.01.15(C)(10)(c); *see also* Md.Code Ann., Educ. § 8–413(h). The law also mandates that a full explanation of these procedural safeguards be giv-

en to the parents whenever the school board receives a referral for an assessment, conducts an evaluation, provides parents with a notice of an IEP meeting, conducts a reevaluation of the child, or receives a request for a due process hearing. *See* COMAR 13A.05.01.11(A)(1)(a)-(e).

These provisions, without a doubt, provide adequate statutory due process consistent with the requirements of 20 U.S.C. §§ 1415(a)-(i) and 34 C.F.R. §§ 300.503–.512. Indeed, over the course of the five day hearing before ALJ Hoffman, and during the abbreviated hearing before ALJ Robinson, the Cavanaghs availed themselves of most, if not all, of these protections.[23] The issue of any inadequacy of the procedures was never raised before the ALJ. Moreover, the Cavanaghs have failed to allege or demonstrate how, if at all, MSDE has failed to follow these procedures or any other protective procedures in the course of litigation in this forum. Therefore, considering the record before me, I conclude as a matter of law that the Cavanaghs' generic claim of lack of statutory due process fails.

ii. The Cavanaghs have failed to raise a serious question regarding the alleged lack of impartiality of ALJs Hoffman and Robinson

The Cavanaghs further allege a lack of impartiality on the part of the ALJs presiding over their due process hearings. In support of this contention, the Cavanaghs allege that ALJ Hoffman "demonstrated personal bias against plaintiff's counsel," 1998 Amended Complaint at 5, ¶ 26, and that the defendants "failed to appoint an impartial ... hearing officer in this matter." *Id.* at ¶ 35.

The requirement of impartiality for ALJs·presiding over special education matters is set forth in controlling federal

---

**23.** The fact that, to date, the Cavanaghs have filed three due process hearing requests—one for each of the three preceding school years—and have extensively utilized the procedures provided for by Maryland law, without making any record of alleged inadequacies makes this claim especially spurious.

regulations, which provide for an "impartial hearing officer." *See* 34 C.F.R. § 300.508 (1999); *see also* 20 U.S.C. § 1415(f) (calling for "an impartial due process hearing, which shall be conducted by the [SEA] or by the [LEA]"). The IDEA itself provides that a "hearing may not be conducted ... [b]y a person who is an employee of the State agency or the LEA that is involved in the education or care of the child; or ... [b]y any person having a personal or professional interest that would conflict with his or her objectivity in the hearing." 34 C.F.R. §§ 300.508(a)(1)-(2); *see also* 20 U.S.C. § 1415(f)(3) (prohibiting the conduct of the hearing by those employees of the SEA or LEA involved in the education of the child); Md.Code Ann., Educ. § 8–413(c)(2)(i) ("In order to conduct a hearing, the Office of Administrative Hearings shall appoint an impartial administrative law judge who ... [h]as no interest that would conflict with the administrative law judge's objectivity ...."). Since "[a]dministrative decisionmakers, like judicial ones, are entitled to a 'presumption of honesty and integrity,'" *Morris v. City of Danville*, 744 F.2d 1041, 1045 (4th Cir.1984) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)), absent a showing of bias stemming from "extrajudicial sources" such as those indicated by 34 C.F.R. § 300.508(a), the presumption supporting the impartiality of the ALJs will remain unrebutted.

■ Considering the record here, I conclude that the Cavanaghs have failed to raise a serious question as to the impartiality of ALJs Hoffman and Robinson. In particular, nothing in the record as a whole discloses that either was an employee of the SEA or LEA involved in the education of Matthew, had personal or professional interests, or any bias stemming from an extrajudicial source, that affected their objectivity and impartiality. *See* 34 C.F.R. §§ 300.508(a)(1)-(2); Md.Code Ann., Educ. § 8–413(c)(2)(i); *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. At bottom, the Cavanaghs appear to equate the ALJs' rejection of the merits of their legal claims

with the presence of personal bias. As discussed above, however, the law makes clear that establishing a claim of bias on the part of the decisionmaker requires a much greater showing than the Cavanaghs have made here.

iii. This Court lacks jurisdiction to evaluate the competency of state ALJs and, in any event, the Cavanaghs have failed to raise a serious question as to the adequacy of the training or competence of ALJs Hoffman and Robinson

■ In the same way the Cavanaghs attempt to transmute the ALJs' rejection of the merits of their legal claims into a disqualifying bias, the Cavanaghs assert an entitlement to relief on the theory that the ALJs lack training and competence. In support of the allegation that the ALJs presiding over their hearings were not competent or knowledgeable, the Cavanaghs assert that ALJ Hoffman "was not competent to conduct a hearing in this matter" 1998 Amended Complaint at 7, ¶ 25; that she "demonstrated limited understanding of the issues presented by the plaintiffs, and no meaningful legal analysis," *id.* at 7, ¶ 28; and that defendants "failed to appoint a competent ... hearing officer in this matter." *Id.* at 8, ¶ 34. In support of their allegation that ALJs were not properly trained, the Cavanaghs assert that "the defendants' fail[ed] to provide adequate training to the administrative law judge." *Id.* at 8, ¶ 52.

Standards for ALJ competency and training are not found within the statutory provisions of the IDEA. Generally set forth in the federal administrative code, however, is the provision requiring that the SEA maintain a list of all "impartial hearing officers," which "must include a statement of the qualifications of each of those persons." 34 C.F.R. § 300.508(c). The Act itself only provides that an "impartial due process hearing ... be conducted by the [SEA] ..., as determined by State law or by the SEA." 20 U.S.C.

§ 1415(f)(1). Thus, ALJ competency and training appear to be governed solely by state law standards. This conclusion is bolstered by comparison to other portions of IDEA in which Congress expressly provided that general competency standards be satisfied. *See, e.g., id.* at § 1415(e)(2)(A)(iii) (requiring that the SEA ensure that the mediation process be "conducted by a qualified ... mediator who is trained in effective mediation techniques"); *id.* at § 1415(2)(2)(C) (providing that the SEA "shall maintain a list of individuals who are qualified mediators and knowledgeable in laws and regulations relating to the provision of special and related services").

The relevant portion of Maryland law governing the general levels of training and competency for ALJs requires that the impartial due process hearing be conducted by a hearing officer who "has received and continues to receive specialized training in matters significant to the educational review of students with disabilities." *See* Md.Code. Ann., Educ. § 8–413(c)(2)(ii); *cf.* Md. R. Jud. Conduct, Canon 3 (providing that a "judge should be faithful to the law and maintain professional competency in it").

In any event, while Congress has abrogated state sovereign immunity with respect to federal claims prosecuted under the IDEA, *see* 20 U.S.C. § 1403(a) ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter."), it has not—indeed, it cannot—abrogate a state's sovereign immunity with respect to state law claims. *See Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Since the Cavanaghs' allegations of lack of competence and training on the part of the ALJs presiding over their hearings assert essentially state law claims, "I do not have jurisdiction to reach [these issues] because a claim that State officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."

*Carnwarth v. Board of Educ. of Anne Arundel County,* 33 F.Supp.2d 431, 434 (D.Md.1998) (citing *Pennhurst*) (internal quotation omitted); *see also Yancey v. New Baltimore City Bd. of Sch. Comm'rs,* 24 F.Supp.2d 512, 515 (D.Md.1998) (entering summary judgment, based on reasons set forth in *Carnwarth,* against a claim asserting the state's failure "to provide a hearing officer who was knowledgeable in the fields and areas of significance to the educational review of this case"). Because the Cavanaghs assert state law claims over which I have no jurisdiction, they are dismissed.

In the alternative, assuming *arguendo* that the IDEA does incorporate state law standards governing the training and qualifications for ALJs, and considering the record here, I am persuaded that the Cavanaghs have failed to raise a serious question regarding the competence of ALJs Hoffman and Robinson.

In particular, nothing in the record as a whole discloses, nor have the Cavanaghs presented in this forum, any evidence whatsoever which suggests that Maryland's ALJ training procedures are inadequate, or in what particular manner ALJs Hoffman and Robinson were not qualified to preside over their hearings. The Cavanaghs purport to demonstrate lack of competence on the part of the ALJs by enumerating a host of alleged factual, evidentiary and legal errors which they claim demonstrate the existence of genuine issues of material fact on the question of ALJ competency. *See* Plaintiffs' Opposition to Local Defendants' Motion for Summary Judgment at 5–8, *passim* (incorporated into Plaintiffs' Opposition to State Defendants' Motion for Summary Judgment at 6). Essentially, on the basis of an agency theory, the Cavanaghs argue that alleged errors committed by the ALJs in the course of the due process hearings are chargeable to MSDE.

I addressed this argument in an unpublished memorandum in *Fox v. Montgomery County Bd. of Educ.,* Civ. No. AMD–

98–200 (D.Md. January 21, 1999), which relied in turn on *Fritschle v. Andes*, 25 F.Supp.2d 699 (D.Md.1998). Rejecting the argument, I reasoned that

> [a] finding that the ALJ committed errors of law or found facts unsupported by substantial evidence will not impute IDEA liability to [MSDE]. Rather, if I am persuaded by plaintiffs to reverse the ALJ's decision, it will of necessity be based on my conclusion that, giving due weight to the ALJ's findings, [the LEA violated the Act]. Any reversal of the ALJs decision *will not rest on the fact that the ALJ, as a "state designee,"* violated the IDEA . . . .

*Fox*, Civ. No. AMD 98–200, at 8–9 (quoting *Fritschle*, 25 F.Supp.2d at 705) (emphasis added). This reasoning applies with equal force to this case and supports the grant of summary judgment in favor of MSDE.

Thus, for all of the reasons set forth herein, MSDE is entitled to judgment as a matter of law as to any claim rooted in alleged procedural infirmities in the administrative proceedings under review. To the extent, however, any alleged procedural error influenced the decisions of the ALJs, they will be discussed in more detail below.

### 2. Substantive Violations

For the reasons explained below, as to the failure of the Cavanaghs to meet their burden in demonstrating that the decision by ALJ Hoffman that PGCPS did not deprive Matthew of a FAPE for the 1997–98 school year was erroneous, no equitable distribution of relief between MSDE and PGCPS is possible, *see Gadsby*, 109 F.3d at 954–55, and summary adjudication in favor of MSDE with respect Counts I, IV, and VII of the 1998 Amended Complaint is appropriate.

---

24. Moreover, even assuming that the Cavanaghs have carried their burden as to one or · more procedural claims, since (as discussed *infra*) they have failed to demonstrate that

### B. Claims Against PGCPS

Plaintiffs assert both procedural and substantive violations against the local defendants for school year 1997–98 and procedural violations for school year 1998–99. They shall be discussed in turn.

### 1. The 1997–98 School Year

As explained herein, the Cavanaghs have arguably made out colorable claims of technical procedural violations in respect to certain of their challenges to the ALJ's resolution of their claims related to 1997–98. Nevertheless, they fail to demonstrate any entitlement to relief because, as explained herein, the ALJ correctly determined that Matthew received all that the IDEA promised him.

#### a. Procedural Violations

I turn now to consider the claims against the local defendants. Proceeding under the same lines of inquiry as dictated by *Rowley*, I must again first determine whether PGCPS committed procedural violations of the IDEA. *See Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. With respect to both the 1998 and 1999 due process hearings, I am satisfied that the Cavanaghs have failed to carry their burden. Therefore, for the reasons set forth below, I will grant summary judgment in favor of PGCPS for alleged procedural violations.[24]

#### i. The Cavanaghs have failed to demonstrate the existence of a genuine issue of material fact regarding the professional certification of Ms. McMullen

The Cavanaghs contend that a genuine issue of material fact exists as to whether PGCPS violated the IDEA by educating Matthew with an uncertified special education teacher. *See* 1998 Amended Complaint at 7, ¶ 49. As support for the assertion that Ms. McMullen, who was Matthew's English, Social Studies

---

such procedural violation(s) actually interfered with the provision to Matthew of a FAPE, *see Gadsby*, 109 F.3d at 956, summary judgment is appropriate.

and Reading teacher in the wing at Kettering, was not qualified as a special education teacher, the Cavanaghs point to two excerpts from Ms. McMullen's testimony. When asked whether she was "a certified special education teacher," Tr. I at 167, Ms. McMullen responded, "No, I'm taking classes toward that." *Id.* When asked again by plaintiffs' counsel whether she was "certified in the State of Maryland," Ms. McMullen again responded "No." *Id.* Later, when asked whether she was a "certified reading specialist," Ms. McMullen again responded, "No, I've been trained in Project Read." *Id.*

Notwithstanding Ms. McMullen's testimony that she was not a certified teacher, PGCPS presented the contrary written testimony of Gwendolyn Mason, the PGCPS Officer for Compliance and Due Process, and the contrary written testimony of Alan Geisler, PGCPS Supervisor of Instructional Personnel, which the ALJ credited. *See* PGCPS Exhibits 3 & 4. Each of these witnesses was subject to cross examination during the first due process hearing. Together, they presented evidence that Ms. McMullen was in fact a

properly certified special education teacher under Maryland law.

To be eligible for IDEA funds, an SEA must "establish and maintain standards to ensure that personnel ... are appropriately and adequately prepared and trained." 20 U.S.C. § 1412(a)(15)(A). These standards must be "consistent with any State-approved or State-recognized certification, licensing, or other comparable requirements that apply to the professional discipline in which those personnel are providing special education or related services." *Id.* at § 1412(a)(15)(B)(i).[25]

The State-recognized certification standards under which PGCPS asserts Ms. McMullen was certified as a special education teacher are codified at COMAR 13A.12.01.05H. During the relevant period covering the 1997–98 school year, COMAR 13A.12.01.05H provided: "A Provisional certificate may be issued to an applicant who does not meet the requirements for a professional certificate under ... this regulation." 25:9 Md. Reg. 694, 697 (April 24, 1998)(proposing amendments to COMAR 13A.12.01.05H).[26] In order to receive a

---

**25.** The Cavanaghs argue that professional certification issues regarding Ms. McMullen fall under the IDEA personnel standards covering "paraprofessionals and assistants." *See* Plaintiffs' Opposition to State Defendants' Motion for Summary Judgment at 8; *see also* 20 U.S.C. § 1412(a)(15)(B)(iii) (allowing SEAs to use appropriately trained and supervised paraprofessionals and assistants to assist in the provision of special education services). This is wrong. The standards governing the professional certification of Ms. McMullen, who principally provided, rather than assisted with, special education instruction in the classroom, *see* 20 U.S.C. § 1401(25)(A) (defining "special education" as "instruction conducted in the classroom"), are governed by 20 U.S.C. § 1412(a)(15)(B)(i) (establishing personnel standards for personnel providing "special education ... services").

**26.** The parties have engaged in a skirmish over the application of 20 U.S.C. § 1412(a)(15)(C), which provides:

> [A] State may adopt a policy that includes a requirement that local educational agencies ... make an ongoing good faith effort to recruit and hire appropriately and adequately trained personnel to provide

special education and related services to children with disabilities, including, in a geographic area of the State where there is a shortage of such personnel, the most qualified individual available who are making satisfactory progress toward completing applicable course work necessary to meet the standards [consistent with applicable State-approved or State-recognized certification, licensing, registration or comparable requirements].

20 U.S.C.A. § 1412(a)(15)(C) (West Supp. 1999). The corresponding federal regulations providing for state personnel standards, *see* *generally* 34 C.F.R. § 300.136(a)-(g), did not become effective until May 11, 1999, and are thus not applicable to this case. *See* 64 Fed. Reg. 12406, 12406 (providing notice of final regulations and effective date) & 12428–29 (publishing final provisions to be codified at 34 C.F.R. § 300.136) (1999).

To bolster the assertion that Ms. McMullen was properly certified under Maryland law, and apparently in reference to this provision, both PGCPS and MSDE contend that PGCPS utilizes the provisional certification procedures set forth at COMAR 13A.12.01.05H— ostensibly under the auspices of 20 U.S.C. § 1412(a)(15)(C)—to make up for a shortage

"Provisional Degree Certificate," an applicant was required to hold a bachelor's degree from an institute of higher education, *see* 25:9 Md. Reg. at 697 (providing pre–1998 language of COMAR 13A.12.01.05H(2)(a)), and follow a course of study created with the local education agency constructed to meet Maryland teaching certification requirements. *See id.* At a minimum, an applicant was required to take at least six semester hours of course work per year toward the professional certification. *See id.* (providing unchanged language of COMAR 13A.12.01.05H(2)(b)). Under Maryland law, a teacher is defined as "one holding a professional certificate, a resident teacher certificate, or a provisional certificate." COMAR 13A.12.01.02.

At the hearing, Mr. Geisler demonstrated PGCPS' compliance with the provisional certification procedures during the 1997–98 school year because Ms. McMullen, who holds a bachelor's degree in Psychology from Rutledge University, was taking or had already taken an appropriate number of graduate level semester hours at Bowie State University pursuant to a plan of study developed with PGCPS officials. *See* Tr. I at 397–98, 401, 407–11; COMAR 13A.12.01.02(25) (providing that a plan of study during provisional certification period be established by the LEA and followed by the applicant). The two Bowie State University graduate courses completed by Ms. McMullen served to satisfy two of six

requirements necessary to receive a teaching certificate in special education. *See* Tr. I at 410; *see also* COMAR 13A.12.02.43B(1)-(6) (setting forth curricular requirements for the certification of special education teachers).

The provisional certification procedures found at COMAR 13A.12.01.05H and the evidence presented by Mr. Geisler and Ms. Mason were analyzed by ALJ Hoffman. *See* Opinion of ALJ Hoffman at 25–26. Ultimately, ALJ Hoffman found that PGCPS did not commit any procedural violation with respect to this claim, *see id.* at 26, and further, ALJ Hoffman concluded that even assuming PGCPS committed a procedural violation, the Cavanaghs had not prevailed in demonstrating that such violation actually interfered with the provision of FAPE. *See id.* at 26–27 (citing *Gadsby*, 109 F.3d at 956). While the Cavanaghs may be partly correct in asserting that ALJ Hoffman did not fully "engage in an analysis of applicable legal authority," Plaintiff's Opposition to Local Defendants' Motion for Summary Judgment at 11, ALJ Hoffman's failure to associate the relevant Maryland law provisions with the relevant portion of the IDEA, namely, 20 U.S.C. § 1412(a)(15)(B)(i), did not render her ultimate conclusion unsound. As the opinion demonstrates, ALJ Hoffman properly explicated the provisional certification procedures set forth in COMAR 13A.12.01.05H (providing for provisional certification) and

---

of certified special education teachers. *See* PGCPS Exhibit 4 at 4; PGCPS Exhibit 3 at 2; Tr. I at 411. The Cavanaghs are correct to point out, however, that this reliance on COMAR 13A.12.01.05H as it is currently written is unfounded, since this was not the form of the regulation as it was in effect during the relevant period covering the 1997–98 school year.

The version of COMAR 13A.12.01.05H that became effective on July 28, 1998, and upon which PGCPS mistakenly relies, reads: *"If a local school system is unable to fill a position with a qualified person who holds a professional certificate, a provisional certificate may be issued to an applicant who does not meet the requirements for a professional certificate under … this regulation." Id.* (italics in

original indicating amended language); *see also* 25:18 Md. Reg. 1435, 1435 (August 28, 1998) (publishing notice of final action on COMAR 13A.12.01.05H). While this added language would appear to satisfy 20 U.S.C. § 1412(a)(15)(C), allowing for a state to adopt a policy to make up for shortages of special education teachers, since it became effective *following* the 1997–98 school year, it is of no avail to PGSPS. Notwithstanding this conclusion, however, the version of COMAR 13A.12.01.05H that was effective during the 1997–98 school year, and which provided the State law basis for the provisional certification of Ms. McMullen, remains entirely consistent with 20 U.S.C. § 1412(a)(15)(B)(i), which, policies aside, governs the professional certification issue in the first instance.

13A.12.01.02(25) (providing for plan of study to be developed by local school officials). *See* Opinion of ALJ Hoffman at 26.

In light of the testimony by Mr. Geisler that Ms. McMullen indeed was hired by PGCPS as a special education classroom teacher for the 1997–98 school year, *see* Tr. I. at 399; that PGCPS developed and submitted a plan of study pursuant to CO-MAR 13A.12.02, *see id.* at 408, and that a provisional teaching certificate for Ms. McMullen for the 1997–98 school year was issued by the State Superintendent of Education and received by PGCPS, *see id.* at 401, 405, I am convinced that ALJ Hoffman's conclusion that Ms. McMullen was properly certified pursuant to state law and consistently with COMAR 13A.12.01.05H(2), as that regulation was in effect during the 1997–98 school year, was made by ALJ Hoffman "in a regular manner and [has] evidentiary support," *Doyle,* 953 F.2d at 103. It must, therefore, be considered *prima facie* correct. *Id.*

Thus, considering ALJ Hoffman's conclusion that Ms. McMulllen was properly provisionally certified as a special education teacher for the 1997–98 school year under COMAR 13A.12.01.05H, as it was in effect during that period, and in light of the applicable IDEA personnel standards, I find that ALJ Hoffman's resolution of the issue effectively constituted a conclusion that Ms. McMullen was certified pursuant to personnel standards that were consistent with "State-approved or State-recognized certification, licensing, registration or other comparable requirements that apply to special education teachers." 20 U.S.C. § 1412(a)(15)(B)(i). Accordingly, I will grant summary judgment in favor of PGCPS as to Count VII of the 1998 Amended Complaint.

ii. As a matter of law, Matthew's placement was not changed following the November 5 ARD Meeting

The Cavanaghs contend that a genuine issue of material fact exists as to whether PGCPS committed a procedural violation of the IDEA by failing to maintain Matthew's educational placement following the November 5 ARD meeting. *See* 1998 Amended Complaint at 7, ¶ 44 (Count IV). The IDEA requires that during the pendency of any proceedings challenging LEA decisions respecting the educational placement of a child, the child must remain in the then-current educational placement. *See* 20 U.S.C. § 1415(j); *see also* COMAR 13A.05.01.14K (recodified at 13A.05.01.15C(14) on July 1, 1999). If, however, the decision made by the LEA did not affect the educational placement of the child, then the above-described "stay-put" provision is inapplicable. Hence, the central question is whether the Cavanaghs have succeeded in generating a serious question as to whether the November 5 modifications to Matthew's IEP amounted to a change in Matthew's educational placement under the Act. *See Deleon v. Susquehanna Community Sch. Dist.,* 747 F.2d 149, 153 (3d Cir.1984) ("If the change ... is not a 'change in educational placement' within the meaning of [§ 1415(j)], then the [LEA] was free to proceed with the change before completing the mandated due process hearing."); *Lunceford v. District of Columbia Bd. of Educ.,* 745 F.2d 1577, 1581 (D.C.Cir.1984) ("Thus, we reach the central question whether the move ... is a change in educational placement under the [IDEA]."). I conclude as a matter of law that the adjustments made to Matthew's schedule following the November 5 meeting were not so significant as to amount to a change in his educational placement, thereby triggering PGCPS's obligation to adhere to the "stay-put" provisions. Accordingly, PGCPS was not obligated to adhere to the stay-put provision provided for by 20 U.S.C. § 1415(j) and COMAR 13A.05.01.14K, and summary adjudication of this claim in favor of defendants is appropriate.

The IDEA does not define what constitutes a "change in placement." *See Honig v. Doe,* 484 U.S. 305, 326 n. 8, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), and, while other circuits have passed on the question of what constitutes a change in placement where the provision of special education services are concerned, the Fourth Circuit

has never specifically reached this issue.[27] In considering what constitutes a change in placement when special education services are at issue, the Third Circuit in *Deleon* proceeded with the understanding that the "question of what constitutes a change in educational placement is, necessarily, fact-specific." *Deleon*, 747 F.2d at 153. In assessing whether a given modification in a child's school day should be considered a "change in educational placement," the Third Circuit also determined that the court should focus on the importance of the particular modification involved. *Id.* Further, while an expansive reading of the term "change in educational placement" is consistent with the remedial purposes of the Act, *see id.*, the Third Circuit concluded that "the touchstone in interpreting section 1415 has to be whether the decision is likely to affect in some significant way the child's learning experience." *Id.*

The Third Circuit's understanding of what constitutes a change in educational placement is generally consistent with the approach of the Fifth, Sixth and D.C. Circuits. In construing § 1415, they held that "an educational placement, for the purposes of [IDEA], is not changed unless a fundamental change in, or elimination of, a basic element of the educational program has occurred." *Sherri, A.D. v. Kirby*, 975

---

27. Cases dealing with 20 U.S.C. § 1415(j), formerly § 1415(e)(3), can generally be categorized into three classes: (1) Cases dealing with disciplinary expulsions of disruptive students who are protected under the IDEA, *see Honig v. Doe*, 484 U.S. 305, 326 n. 8, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (finding with respect to disruptive students that an expulsion of greater than ten days constitutes a "change in placement"); *Commonwealth of Virginia Dep't of Educ. v. Riley*, 106 F.3d 559 (4th Cir.1997) (per curiam) (holding that the IDEA does not require states to provide a FAPE to handicapped students expelled or suspended for criminal or other serious misconduct wholly unrelated to their disabilities); (2) Cases dealing with wholesale school closings based on fiscal or other policy considerations determined by the local school board, *e.g., Tilton v. Jefferson County Bd. of Educ.*, 705 F.2d 800, 805 (6th Cir.1983) (holding that a school district's closing of a day treatment facility and transferring the students to another facility was a change in educational placement, but the "stay put" provisions of the IDEA do not apply given the fiscal and policy reasons supporting the decision); *Concerned Parents & Citizens for Continuing Educ. at Malcolm X (PS 79) v. New York City Bd. of Educ.*, 629 F.2d 751, 756 (2d Cir.1980) (holding that closing a school and transferring disabled students to schools within the school district with special education classes substantially similar to their former classes did not constitute a "change in placement" under the IDEA); and (3) Cases dealing with adjustments to special educational services provided to an individual student, *e.g., Sherri, A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir.1992) (holding that order transferring disabled child from residency to outpatient status and receiving educational services from the school district did not constitute a "change in edu-

cational placement" under the IDEA); *De-Leon v. Susquehanna Community Sch. Dist.*, 747 F.2d 149, 153 (3d Cir.1984) (holding that a change in the method of transporting a disabled student to and from school did not constitute a "change in placement" under the IDEA); *Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577 (D.C.Cir.1984) (holding that change in feeding program that a profoundly disabled student would receive as a result of a transfer was insufficient to constitute a "change in educational placement" under the IDEA); *Tennessee Dep't of Mental Health and Mental Retardation v. Paul B.*, 88 F.3d 1466, 1474 (6th Cir.1996) (reversing district court decision that school board's failure to inform parent of "stay-put" notice provisions violated IDEA where facts did not establish that parent would have used them); *Cronin v. Board of Educ. of the East Ramapo Cent. Sch. Dist.*, 689 F.Supp. 197, 203 (S.D.N.Y.1988) (holding that graduating a disabled student constitutes a "change in educational placement" under the IDEA).

While the Fourth Circuit has passed on the first class of cases—those dealing with the expulsion of disruptive students, *see Riley*, 106 F.3d 559—it has not had occasion to reach the second and third classes. Given that this case involves the provision of special education services to an individual student, the principles set forth in *Sherri, A.D., Deleon, Lunceford*, and *Cronin* should govern. *See Deleon*, 747 F.2d 149, 153 (determining that the narrow reading of § 1415(e)(3) given by *Concerned Parents*, since that case involved "not only the interests of a large number of children but also a substantial fiscal policy question," should not govern "where changes affecting only an individual child's program are at issue.").

F.2d 193, 206 (5th Cir.1992) (citing *Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577, 1582 (D.C.Cir.1984)); *Tennessee Dep't of Mental Health and Mental Retardation v. Paul B.*, 88 F.3d 1466, 1474 (6th Cir.1996) ("One must identify a detrimental change in the elements of an educational program in order to qualify for the 'stay put' provision.").

■ The teachings of these cases is that a fundamental change in, or elimination of a basic element of, the educational program, which adversely affects the child's learning experience in a significant way, is what constitutes a "change in educational placement" for purposes of the IDEA.

Insight into what constitutes a "fundamental" change to a basic element of a child's educational program is provided by a policy statement of the United States Department of Education Office of Special Education Programs ("OSEP"). *Cf. Honig*, 484 U.S. 305, 326 n. 8, 108 S.Ct. 592, 98 L.Ed.2d 686 (deferring, based on statutory ambiguity, *INS v. Cardoza–Fonseca*, 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), to the position adopted by an OSEP policy letter advising that a suspension of greater than 10 days constitutes a "change in placement" under the IDEA). In a Policy Letter cited by both parties and analyzed by ALJ Hoffman, *see* Opinion of ALJ Hoffman at 27–29, OSEP concludes that whether a change in educational placement has occurred turns on "whether the proposed change would substantially or materially alter the child's educational program." U.S. Dept. of Educ., Office of Special Education Programs, *Policy Letter to Fisher* (Apr. 18, 1994), at 4–5, 21 IDELR 992, 993–95. In

determining whether a proposed change will substantially or materially alter child's educational program, OSEP advises courts to consider: (a) whether the educational program set out in the child's IEP has been revised; (b) whether the child will be able to be educated with non-disabled children to the same extent; (c) whether the child will have the same opportunities to participate in non-academic and extracurricular services; and (d) whether the new placement option is the same option on the continuum of alternative placements. *See id.; see also Henry v. School Administrative Unit # 29*, 70 F.Supp.2d 52, 59 (D.N.H. 1999)(analyzing "stay put" claim under OSEP guidelines provided in *Letter to Fisher*).

■ As described in detail above, three minor modifications were made to Matthew's schedule as a result of the November 5 meeting: (1) a reading objective was added to Matthew's IEP; (2) Matthew was transferred from the CRI class to a self-contained Science and Health class; and (3) Matthew's participation in CBI field trips became optional. *See* Opinion of ALJ Hoffman at 27. The goals and objectives spelled out in Matthew's IEP, with the exception of the added reading objective, among fifty-six others, remained the same. *See* Opinion of ALJ Hoffman at 27; *see also* PGCPS Exhibit 1 at 3(IEP). In addition, as ALJ Hoffman found, "under the revised schedule ... the Student was to continue to receive special education services for the same number of hours per week." *Id.* Indeed, following the November 5 meeting, Matthew spent the same amount of time in the Kettering wing as he did before the meeting. *See* Opinion of ALJ Hoffman at 28.[28] Since none of the

28. The Cavanaghs have raised the issue that, it appears, resulted from a misunderstanding arising from the quarterly change in the subject taught in Matthew's Creative Arts class. The effective date of the November 5 adjustments to Matthew's schedule coincided, unfortunately, with the turn of the quarter at Kettering. This resulted in the quarterly change of the subject matter covered in Matthew's Creative Arts art class to "Power Math," a regular education class designed to

help students pass the Maryland Functional Test, an exam required to receive a high school diploma. Matthew was assigned difficult homework assignments that he could not do. This caused both him and his parents a substantial amount of frustration, which they expressed to officials at Kettering. *See* Parents Exhibit 7. The beginning of Matthew's Power Math class, however, had nothing whatsoever to do with any of the adjustments made to Matthew's schedule at the November

arrangements for Matthew to attend his regular education Physical Education and Creative Arts classes were changed following the November 5 meeting, Matthew's opportunity to be educated with non-disabled peers remained unchanged. *See* Opinion of ALJ Hoffman at 28; *Letter to Fisher*, 21 IDELR 292, 293–95. The adjustments, moreover, did not touch on any aspect dealing with Matthew's ability to participate in extracurricular activities. *See* Opinion of ALJ Hoffman at 28; *Letter to Fisher*, 21 IDELR 292, 293–95. The individual and cumulative effect of these adjustments [29] cannot be characterized as constituting a "fundamental change in ... a basic element of the educational program." *Sherri, A.D.*, 975 F.2d at 206; *Lunceford*, 745 F.2d at 1582.

As in *Lunceford*, of particular significance for the case at hand is the observation that "an interpretation of change in 'educational placement' that would include every curriculum change 'would virtually cripple [PGCPS'] ability to implement even minor discretionary changes within the educational programs provided for its students.'" *Lunceford*, 745 F.2d at 1582 n. 5 (citing *Concerned Parents*, 629 F.2d at 754). The D.C. Circuit further noted reasoning from *Concerned Parents* which posited that "a move from a 'mainstream' program to one consisting only of handicapped students would constitute a change in placement; a move from one mainstream program to another, with the elimination of a theater arts class, would not be such a change." *Lunceford*, 745 F.2d at 1582.

In Matthew's case, the move from the CRI special education class to the self-contained Science and Health special education class in effect amounted to no more than a discretionary curriculum change from one special education class to another. Similarly, Matthew's opportunity to participate in the CBI field trips was not limited by the changes made at the November 5 meeting. Rather, as the evidence demonstrated, Matthew was free to participate in CBI field trips and benefit from the functional training provided whenever his parents consented. Given the nature of these changes as analyzed under *Letter to Fisher*, ALJ Hoffman was correct in her assessment that "[o]nly the most strained interpretation of the evidence would allow one to characterize

ARD meeting. *See* Tr. I at 125–27 ("Q: So it was anticipated from the very beginning [of the school year] that [Matthew] was going to participate in the power math class? A: Yes.") (Testimony of Katherine Ogden).

29. The following table represents Matthew's schedule as it was developed from his September 11 IEP. Changes to Matthew's schedule arising out of the November 5 IEP review meeting are represented in parentheses:

|  | Mod 1 | Mod 2 | Mod 3 | Mod 4 | Mod 5 | Mod 6 |
|---|---|---|---|---|---|---|
| **Mon.** | Social Studies/Reading | Math | English (Science/Health) | Lunch | CRI (English) | Creative Arts |
| **Tues.** | Social Studies/Reading | Math | CBI (Science/Health/ CBI with consent) | CBI (Lunch/CBI with consent) | CBI (English/CBI with consent) | Creative Arts |
| **Wed.** | Social Studies/Reading | Math | English (Science/Health) | Lunch | CRI (English) | Creative Arts |
| **Thurs.** | Social Studies/Reading | Math | English (Science/Health) | Lunch | Reading (English) | Creative Arts |
| **Fri.** | Social Studies/Reading | Math | English (Science/Health) | Lunch | Reading (English) | Creative Arts |

*See* Parents Exhibits 13 and 17; Tr. I at 147–48, 164–67 (Testimony of Ms. McMullen).

[this] curriculum change as a change in placement." Opinion of ALJ Hoffman at 28; *Lunceford,* 745 F.2d at 1582 & n. 5.

The determination that Matthew's educational placement was not changed as a result of the November 5 meeting is further supported by comparison to an opposite result reached in *Henry.* In *Henry,* the district court, pursuant to *Letter to Fisher* and other "change in placement" precedent herein cited, considered the following facts significant in establishing the conclusion that the student's educational placement had been changed. First, the student at issue in *Henry* encountered significantly greater student-teacher ratios when his program was changed. *See Henry,* 70 F.Supp.2d at 60. This was not true in Matthew's case. The student-teacher ratios within the wing were roughly constant, as they are controlled by COMAR 13A.05.01.10E(5); *see also* Tr. I at 28–29.

Second, following the changes, the student at issue in *Henry* was placed in an environment that was significantly less structured than the one to which he was previously accustomed. 118 Ohio App.3d 516, 693 N.E.2d 821. Matthew, by contrast, remained substantially in the same environment, spending the same number of hours with the same students and teachers within the Kettering special education wing. *See* Tr. I at 28–29 (Testimony of Katherine Ogden) (stating that self-contained classes and CRI instruction are carried out in the special education wing).

Third, following the changes, the student in *Henry* experienced a change in the amount and quality of his exposure to non-disabled students in athletic and social activities by participation in programs that were not geared to handle his special needs. 118 Ohio App.3d 516, 693 N.E.2d 821. By contrast, Matthew's opportunity to interact with non-disabled peers was not changed as a result of the November 5 meeting and the nature of his interaction with non-disabled peers in regular education classes was not affected.

Finally, in *Henry,* the student was removed from an environment where he was surrounded with students with similar learning disabilities to one that was predominated by non-disabled students. 118 Ohio App.3d 516, 693 N.E.2d 821. These changes, the district court concluded, amounted to a change of the student's placement along the alternative placement continuum. *See id.* By contrast, following the November 5 meeting Matthew remained in programs contained within the special education wing at Kettering. Moreover, Matthew continued to be able to participate in CBI with parents consent. *See* Tr. I at 111–13. The options for alternative placements, therefore, remained the same for Matthew following the November 5 meeting.

After a searching review of the record here, I am satisfied that Matthew's educational placement was not changed following the November 5 ARD meeting. Consequently, PGCPS was not required to adhere to the stay put provisions. *See De-Leon,* 747 F.2d at 153 ("If the change ... is not a 'change in educational placement' within the meaning of [§ 1415(j)], then the [LEA] was free to proceed with the change before completing the mandated due process hearing."); *Lunceford,* 745 F.2d at 1581. In particular, the record does not disclose, nor have the Cavanaghs produced in this forum, any evidence which unseats ALJ Hoffman's sound conclusion, made "in a regular manner .. [with] evidentiary support," *Doyle,* 953 F.2d at 103, that the changes were not so significant so as to amount to a change in Matthew's educational placement. *See* 20 U.S.C. § 1415(j); COMAR 13A.05.01.14K. Summary judgment, therefore, is appropriate in favor of PGCPS as to Count IV of the 1998 Amended Complaint.

iii. Even if the Cavanaghs have demonstrated gaps in the reasoning of the ALJ in respect to the intensity of special education services provided to Matthew and in respect to PGCPS's less-than-strict conformity to relevant state standards, they fail to demonstrate how these ostensible procedural violations interfered with the provision of FAPE to Matthew

■ The Cavanaghs contend that a prima facie procedural violation of IDEA inheres in PGCPS's failure to provide fully the number of hours of special education instruction called for in Matthew's IEP. In addition, they allege that PGCPS committed a procedural violation by failing to maintain student-teacher ratios as mandated by COMAR 13A.05.01.10E(5). They support these assertions in part by referring to the absence in the record as a whole of any explanation of how the hours called for in Matthew's IEP were actually met, *see* Plaintiff's Opposition to Local Defendants' Motion for Summary Judgment at 8, and in part by the absence of specific findings regarding whether the weekly 27.5 hours of special education services called for in Matthew's IEP were in fact actually received or expressly resolving certain evidentiary conflicts. *See id.* As explained below, even if these contentions are colorable, at the end of the day, they are unavailing.

A. Hours of special education instruction

Intensity IV services, which were called for in Matthew's IEP, *see* PGCPS Exhibit 1 at 15(IEP), are appropriate for the student who may be served by "special educational services for more than 3 hours per day." COMAR 13A.05.01.10E(5). These three hours include instruction provided by a special education teacher, as well as any related or itinerant services described in the IEP. *See id.* Where a full-time aide is provided, students receiving Intensity IV services may be instructed in class sizes that do not exceed an average of thirteen students. *See id.*

At the hearing, ALJ Hoffman found—and all parties agree—that Matthew's IEP called for 27.5 hours of special education services and 3.5 hours of regular education instruction, though she concluded that the "IEP did not specify the number of hours [Matthew] would spend weekly in the CRI class and the self-contained class." *See* Opinion of ALJ Hoffman at 14, 42; PGCPS Exhibit 1 at 15(IEP). ALJ Hoffman found that Matthew's IEP called for a Physical Education and a Creative Arts general education class. *See* Opinion of ALJ Hoffman at 14. ALJ Hoffman was familiar with the schedule providing instruction in self-contained classrooms, *see id.* at 14, ¶ 9 (listing self-contained classes as Reading, English and Social Studies and Math), as well as with the quarterly components of Matthew's Creative Arts general education elective class, *see id.* (listing Art, "Power Math," Music and Drama). Notwithstanding these findings, the Cavanaghs are correct in their assertion that ALJ Hoffman's opinion is silent on the matter of whether the weekly number of hours of special education instruction received by Matthew was consistent with those envisioned in his IEP.

Evidence in the record discloses that each of the six "mods," or periods, in Matthew's schedule at Kettering lasted approximately 72 minutes. *See* Tr. I at 189 (Testimony of Ms. McMullen); Tr. I at 116–22 (Testimony of Katherine Ogden). Of the six mods during Matthew's school day, excluding lunch and Matthew's regular education Creative Arts class, four of the mods were allocated to self-contained special education classes or to CBI/CRI classes. *See* Parents Exhibit 17 (Schedule, Matthew Cavanagh). The record is devoid of any evidence contradicting this understanding. According to the schedule, which was admitted without objection, *see* Tr. I at 727–728, therefore, Matthew received an average of 4.8 hours (72 minutes × 4 mods) of special education instruction daily. This amount of instruction is clearly consistent with Intensity IV education services calling for three hours or more of

special education instruction per day. *See* COMAR 13A.05.01.10E(5). However, over a week-long period, as demonstrated in the evidence, *see* Parents Exhibit 17 (Schedule, Matthew Cavanagh), Matthew's schedule only provided for approximately 24 hours (4.8 hours daily × 5 school days weekly) of special education instruction per week. Consequently, a three and one-half hour per week shortfall existed between the 27.5 hours of special education services provided for in Matthew's IEP and the 24 hours of services Matthew actually received. Even assuming that the called for itinerant psychological and occupational services, *see* PGCPS Exhibit 1 at 15(IEP), could make up for this shortfall, *see* COMAR 13A.05.01.10E(5)(describing services to include "special education provided by a special education teacher, and related services described in the [IEP]"), evidence in the record which illustrates the rarity of occasions on which these services were provided clearly negates this possibility. *See* Opinion of ALJ Hoffman at 42 (stating that psychological services did occur during the school year on an "as-needed bases"); Tr. I at 172–73 (stating that Matthew only received psychological or occupational therapy on a consult or "as-needed" basis).

In light of this evidence, and after a careful review of ALJ Hoffman's findings and conclusions, I agree with the Cavanaghs that ALJ Hoffman's conclusion that "the inclusion of general elective classes [did] not interfere with the provision of special education instruction for a weekly total of 27.5 hours," *id.* at 42, did not address this question satisfactorily.

While this conclusion adequately addresses the issue of the allocation of hours between special education and regular education classes, it does not explain how, if at all, PGCPS in fact provided the 27.5 hours of special education instruction as spelled out in Matthew's IEP. From my review of the record, the hours do not add up and ALJ Hoffman's conclusion is not entitled to prima facie correctness. *See Doyle,* 953 F.2d at 103; *Gerstmyer v. Howard County Pub. Sch.,* 850 F.Supp. 361, 364 (D.Md. 1994).

## B. Student-teacher ratio

The Cavanaghs further contend that Matthew was educated in classes which exceeded the maximum number of students permissible. The relevant state standard, COMAR 13A.05.01.10E, provides that Intensity IV special education instruction at the elementary level [30] must be furnished in class sizes not exceeding an average of thirteen students. *See* COMAR 13A.05.01.10E(5). Addressing the teacher-student ratio, ALJ Hoffman cited to Kettering Wing Coordinator Katherine Ogden, who testified that the self-contained classes are comprised of "twelve to fourteen students with a teacher, a teacher assistant, and, in [Matthew's] case, a one-to-one aide." Opinion of ALJ Hoffman at 42; *see also* Tr. I at 28–29 (Testimony of Katherine Ogden) (stating that self-contained classes are comprised of "about 12 to 14 students in each class."); *id.* at 579 (Testimony of Katherine Ogden) (stating that "[i]n each of those classes an average about 14—maybe an average of 12."). ALJ Hoffman further found that the CRI classes that Matthew attended were comprised of two groups of eight students, which met both separately and together. *See* Opinion of ALJ Hoffman at 42.

The Cavanaghs rely on the conflicting testimony given by Ms. McMullen, in which she stated that there are fourteen students in her Reading/Social Studies class, and fifteen students in her English class. *See* Plaintiff's Opposition to Local Defendants' Motion for Summary Judgment at 8 (citing Tr. I at 147–48). For reasons not stated in the Opinion, ALJ

---

**30.** During the relevant period Matthew was in the eighth grade, which is still considered to be "elementary," as opposed to "secondary" level education. For secondary level special education instruction, COMAR provides that class sizes should not exceed an average of

Hoffman does not address this apparent discrepancy. It would appear that ALJ Hoffman chose to credit the testimony of Katherine Odgen, as the Wing Coordinator at Kettering, on this point.

Taking as true the fact that PGCPS did commit a procedural violation with respect to the shortfall in the number of hours of special education provided to Matthew compared to the number allocated in his IEP, and even assuming that the Cavanaghs are correct in their assertion that Matthew was educated in class sizes that slightly exceeded COMAR limits, the Cavanaghs are still confronted with the task of demonstrating how these violations interfered with the provision of FAPE. *Gadsby,* 109 F.3d at 956. As I explain below, they have failed to undermine the presumptive correctness of ALJ Hoffman's conclusion that PGCPS did provide Matthew with a FAPE for the 1997–1998 school year.

b. Substantive Violations

■ Having considered the Cavanaghs' showing as to the existence of procedural violations by PGCPS, and having concluded with respect to the intensity of special education services provided to Matthew during the 1997–98 school year that they have rebutted the presumption of correctness as to the ALJ's finding, I proceed under the second prong of *Rowley.* It becomes now my task to evaluate whether "the individualized educational program developed through the Act's procedures was reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034. As the Court in *Rowley* observed, it was the intent of Congress in enacting the IDEA that disabled children would be provided a basic floor of opportunity, but beyond this Congress did not impose any particular substantive standard the states had to meet. *See id.* at 200, 102 S.Ct. 3034. All that is required by the IDEA is that the education provided be sufficient to confer some educational benefit to the child. *See id.* at 200–01, 102 S.Ct. 3034.

While each child should receive an education appropriate to his or her unique needs, the IDEA does not necessarily mean that every individual student's potential must be maximized. *See id.* at 199, 102 S.Ct. 3034. There is no requirement that guarantees a particular outcome for the child. *Id.* at 192, 102 S.Ct. 3034.

Again, the burden of proof of establishing a substantive violation of the IDEA falls on the Cavanaghs as the parties challenging the administrative findings, *see Barnett,* 927 F.2d at 152; *King,* 999 F.Supp. at 766. At bottom, I must determine whether the Cavanaghs have projected sufficiently persuasive evidence that Matthew's placement for the 1997–98 school year at Kettering was not reasonably calculated to provide him with educational benefit and that the ALJ's contrary conclusion should be rejected as a matter of law or fact. *See Fritschle v. Andes,* 45 F.Supp.2d 500, 505 (D.Md.1999).

After carefully examining the record, I conclude, for the reasons set forth below, and taking fully into consideration the procedural infirmities identified above, *see Gadsby,* 109 F.3d at 956, that the Cavanaghs have not genuinely undermined the ALJ's reasoned conclusion that the IEP and Matthew's corresponding placement at Kettering were reasonably calculated to provide Matthew with an educational benefit.

The Cavanaghs do not contend that the contents of the IEP developed for Matthew were inadequate. *See* Tr. I at 160–61 ("This is not a challenge to the IEP. It's a challenge to whether the placement . . . is [providing] educational benefit for Matthew . . . ."). It is clear from the record that they made significant contributions, through the assistance of Dr. Soloman, in the IEP development process. *See* Opinion of ALJ Hoffman at 11, 13; Tr. I at 722–227 (Testimony of Dr. Soloman). Rather, their discontent rests in the belief that Matthew's placement at Kettering was inappropriate. The Cavanaghs place

fifteen students. *See* COMAR 13A.05.01.10E(5).

heavy reliance on the opinion of Dr. Soloman, their educational expert, to support their claim that a genuine issue of material fact exists as to whether Matthew's placement at Kettering for the 1997–98 school year was appropriate, *i.e.*, whether Matthew received an educational benefit as demonstrated by his progress or lack thereof at Kettering.

The record reflects that Dr. Soloman conducted an initial intake evaluation of Matthew on July 8, 1997; conducted reading and language supplementary testing on July 16, 1997, *see* Opinion of ALJ Hoffman at 20; Tr. I at 698–99, 702; Parents Exhibit 15 at 1–2 (Supplementary Testing Report of Dr. Soloman); and conducted an additional diagnostic reading evaluation of Matthew on October 24, 1997, *see* Opinion of ALJ Hoffman at 20; Tr. I at 709. In addition, Dr. Soloman observed Matthew while he was at Kettering on October 29, 1997. *See* Opinion of ALJ Hoffman at 20; Tr. I at 729–39. Based on her evaluations and observations, which were generally limited to Matthew's reading and language abilities, Dr. Soloman testified that Matthew had not mastered any of the goals and objectives set forth in his IEP. *See* Tr. I at 773–79. The Cavanaghs argue that ALJ Hoffman committed error by failing to credit Dr. Soloman's expert testimony on the issue of the appropriateness of Matthew's educational placement at Kettering, and that she committed further error by crediting the non-expert testimony of Ms. McMullen instead. The Cavanaghs' argument on this issue is unpersuasive.

In arriving at the determination that Matthew was in fact receiving an educational benefit from his placement at Kettering, ALJ Hoffman heavily relied on evidence presented by Ms. McMullen. *See* Opinion of ALJ Hoffman at 31–34. In response to the Cavanaghs' arguments that Ms. McMullen's testimony should not

be credited, ALJ Hoffman explained that while Dr. Soloman advocated "admirably" for Matthew, Dr. Soloman did "not observe [Matthew] on a daily basis in the school setting, as his teachers and administrators do. The teachers who work with the Student day in and day out are, logically, better able to gauge his progress toward the goals and objective identified in the IEP." *Id.* at 40. Accordingly, in the eyes of ALJ Hoffman, Dr. Soloman was not, as the Cavanaghs contend, the sole expert to testify in this matter. *See id.* ALJ Hoffman found, moreover, that Ms. McMullen "testified with clarity, and exhibited extensive knowledge regarding the Student's achievements during the school year." *Id.* at 33.

ALJ Hoffman's conclusion that Matthew was making educational progress at Kettering is supported by the evidence. *See Doyle*, 953 F.2d at 103. Dr. Soloman testified that in her opinion the Project Read computer program,[31] under which a portion of Matthew's reading instruction was conducted, was inappropriate as a primary mode of instruction in reading. *See* Tr. I at 741–43. In expressing this opinion, Dr. Soloman emphasized that she believed that Matthew needed a person to assist him with breaking down words and recognizing vowel sounds. *See* Tr. I at 742. The evidence discloses, however, that while Dr. Soloman did in fact inspect the Project Read program in the absence of students, *see* Tr. I at 738–39, she never observed, nor could offer comment on, the manner in which Ms. McMullen, her teaching assistant, and Matthew's personal aide, *see* Tr. I at 135, instructed Matthew in class.

Assuming, however, that Dr. Soloman is correct that use of the Project Read program as the sole means of instructing Matthew in reading is inappropriate, this opinion still does not contradict the clear

---

**31.** Project Read is a "multisensory systematic" computer program used by PGCPS to teach reading skills to its students. *See* Tr. I at 137–38. Each individual student interacts with the program using a computer and headphones. *See id.* at 738. In order to pass from

one lesson to the next, the program requires the student to achieve a score of 85 percent or higher. *See id.* at 742. The program keeps a record and a printout can be made of each individual student's scores over time. *See id.* at 740–41.

evidence presented by the Cavanaghs themselves disclosing Matthew's Project Read results. By Dr. Soloman's own account, these results demonstrate that Matthew indeed made progress. *See* Tr. I at 743 ("[Matthew's] first attempt on the short vowel A lesson ... says 60 percent .... And then when he did it again a couple of days later there was an improvement to 85 percent.") (Testimony of Dr. Soloman). A further example of Matthew's progress is seen in Matthew's initial failures and ultimate success in passing the "Following Sequential Directions" lesson. On his first try, Matthew scored a 59 percent. On his second try, he scored a 74 percent. On his third try, he finally scored 86 percent and was permitted to move on to the next lesson. *See* Parents Exhibit 18 (showing that Matthew successfully completed 19 different reading assignments). Clearly, these results are consistent with Ms. McMullen's testimony that Matthew made progress toward meeting his reading objectives, *see* Tr. I at 138 (stating that Matthew had made progress in recognizing the symbol for and the sound made by particular vowels and using these techniques to decode words), and they support ALJ Hoffman's reliance on Ms. McMullen's testimony in general.

Moreover, Dr. Soloman's testimony did not touch on many issues relevant to whether Matthew was making progress in other areas. For example, Dr. Soloman's testimony did not contradict or rebut testimony given by Ms. Robinson, Matthew's Math teacher. *See* Tr. I at 779 (testifying that "I did not test anything but reading, October 24," and that any observations of Matthew doing math was "informal")(Testimony of Dr. Soloman). Ms. Robinson testified that in her assessment Matthew had made progress in math as well as in attending and organizational skills. *See* Tr. I at 236; Opinion of ALJ Hoffman at 34. After he entered Kettering, Ms. Robinson found that Matthew could calculate more money combinations and make trades of equal value. *See* Tr. I at 239–40. In general, she believed that, based on her observations of his written and oral participation in class, he made meaningful educational progress at Kettering. *See id.* at 733–56.

Similarly, Dr. Soloman's testimony offered nothing to contradict the testimony of Susan Hollingshead, the Kettering Psychologist, who testified that Matthew had benefitted from his interactions with non-disabled peers and, despite the difficulty of the subject matter covered, was becoming more confident and had developed positive relationships in his Power Math class. *See* Tr. I at 327–30; Opinion of ALJ Hoffman at 34–35. Nor did Dr. Soloman's testimony contradict Katherine Ogden, who testified in the same vein, stating generally that Matthew was benefitting from his placement at Kettering. *See* Tr. I at 53–57, 62–66.

The tenor of the Cavanaghs' evidence and arguments on the issue of the appropriateness of Matthew's placement at Kettering suggest their belief in the proposition that if there exists another placement—the TBI class at Kennedy Kreiger, for example—which may be a more appropriate placement for Matthew, then his current placement must, *a fortiori*, be inappropriate. This view of what the IDEA requires has been rejected. *See King*, 999 F.Supp. at 772 (citing *Hessler v. State Bd. of Educ.*, 700 F.2d 134, 139 (4th Cir.1983) (holding that the fact that the program proposed by the parents is allegedly more appropriate does not mean that the program proposed by the state is inappropriate)). It must be rejected here as well.

Finally, examining the evidence presented by the Cavanaghs through Dr. Soloman on the issue of Matthew's progress at Kettering, and accepting for the moment that Dr. Soloman's opinion that Matthew had not *mastered* any of his goals and objectives was sound as an empirical matter, *see Matsushita*, 475 U.S. at 587–88, 106 S.Ct. 1348, the unfortunate fact yet remains that Dr. Soloman's opinion did not respond to the more refined and critical issue of whether Matthew had made *progress* at

his placement at Kettering. For, by furnishing Dr. Soloman's opinion solely on Matthew's lack of mastery of his IEP goals and objectives, *see* Tr. I at 773–79, the Cavanaghs failed to present any evidence to negate the extensive testimony presented by PGCPS (principally through Ms. McMullen) that, notwithstanding Matthew's lack of *mastery* of his IEP goals and objectives, he was making more than trivial progress. *See* Tr. I at 138–43, 173–83 (Testimony of Ms. McMullen); *see also id.* at 238–50 (Testimony of Ms. Robinson).

Dr. Soloman's opinion—expert, objective or otherwise—that Matthew had not achieved educational mastery in effect was a statement that Matthew had failed to achieve his summit. The critical issue, however, was whether Matthew was making more than trivial progress above the base of his educational mountain. *See Hall,* 774 F.2d at 636. This flaw in the Cavanaghs' evidence is fatal, *see Rowley,* 458 U.S. at 199, 102 S.Ct. 3034 (holding that the IDEA does not require that a student's potential be maximized); *King,* 999 F.Supp. at 766 (same, quoting *Rowley*), and ALJ Hoffman's decision not to credit Dr. Soloman's opinion on the issue of whether Matthew was receiving educational benefit at Kettering is entirely consistent with the actual, as opposed to perceived, requirements imposed by the IDEA.

Given the reasoning manifest in her opinion and the ample evidence supporting ALJ Hoffman's decision to credit PGCPS evidence over the evidence presented by the Cavanaghs, and bearing in mind that implicit in *Doyle,* 953 F.2d at 104–05, is the principle that credibility determinations of local level hearing officers who themselves have had the benefit of personal observation of the witnesses are not to be lightly disregarded, *see King,* 999 F.Supp. at 769–71, and also bearing in mind that findings of the ALJ, when made in a regular manner and have evidentiary support are considered *prima facie* correct, *see Doyle,* 953 F.2d at 103, ALJ Hoffman's reliance on Ms. McMullen's testimony *qua* teacher to support her conclusion that Matthew received educational benefit at Kettering was not error as the Cavanaghs allege.

Plaintiffs' discontent notwithstanding, the IEP developed by the ARD team in September and the schedule and services by which it was effectuated at Kettering did not deprive Matthew of a free and appropriate education. As I found above, the Cavanaghs' objections to the changes that were made to Matthew's schedule at the November 5 meeting were objections to just that: the schedule.

Rather than enunciating actionable claims against PGCPS under the IDEA, the Cavanaghs' true complaint, it would appear, arises from the terms of the August 1997 settlement agreement arrived at between themselves and PGCPS which, presumably, the Cavanaghs feel were breached. Inferring from the level of disappointment expressed by the Cavanaghs, it would also appear that they were under the impression that the terms contracted for under that agreement equalled the IDEA standards providing for FAPE. Since the findings of the ALJ support her conclusion that PGCPS provided Matthew with FAPE for the 1997–98 school year, the Cavanaghs' only recourse is to, if possible, bring action under their settlement agreement. Given that the terms of the agreement were expressly excluded from the evidence accepted by the ALJ, *see* Tr. I at 105–07, that issue is not before me.

Therefore, after thorough review of the record below, I find, drawing all inferences therefrom favorable to the Cavanaghs, *see Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348, that they have failed in their burden of establishing the existence of a genuine issue of material fact regarding whether Matthew received an educational benefit while he was at Kettering during the 1997–98 school year. *See Rowley,* 458 U.S. at 207, 102 S.Ct. 3034; *Fritschle,* 45 F.Supp.2d at 505; *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505. In particular, the record does not disclose, nor have the Cavanaghs produced in this forum, any evidence which unseats ALJ Hoffman's sound conclusion, made "in a regular manner . . .

[with] evidentiary support," *Doyle,* 953 F.2d at 103, that over the relevant period during the 1997–98 school year Matthew made what amounted to more than trivial progress while he was at Kettering. *See Hall,* 774 F.2d at 636. Summary judgment, therefore, is appropriate in favor of PGCPS as to Count I of the 1998 Amended Complaint. Since the factual and legal predicate to Count V of the 1998 Amended Complaint is a finding that PGCPS did not provide Matthew with a FAPE for the 1997–98 school year, a finding which I do not here make, it is dismissed.

### 2. The 1998–99 School Year

Shifting focus from the 1997–98 school year to the 1998–99 school year, the Cavanaghs allege that ALJ Robinson "committed error by dismissing the case, and failing to enter a consent order." 1999 Complaint at 5, ¶ (Count I). The Cavanaghs also allege that the "failure of defendants to provide plaintiffs with adequate due process procedures, including a hearing before a knowledgeable, competent impartial hearing officer, violates the IDEA, Section 504, Section 1983, and Maryland law." *Id.* at 6, ¶ 30 (Count II). I already considered these issues as they concern MSDE above and following an analysis of the governing law and in consideration of the absolute lack of evidence presented by the Cavanaghs on these claims, I granted summary judgment in favor of MSDE. I now consider these claims only as they concern PGCPS and conclude, for the reasons set forth below, that the Cavanaghs have failed to demonstrate a genuine issue of material fact as to either of these Counts. Accordingly, I will grant summary judgment for PGCPS.

a. ALJ Robinson's decision to dismiss the Cavanaghs' case was not arbitrary and capricious, nor was it an abuse of discretion.

The fact that ALJ Robinson did not enter a consent order to memorialize the agreement arrived at between PGCPS and the Cavanaghs was not error because there was, as she explained, "no longer an existing controversy between the parties ... [and thus there was] no longer any effective remedy the court" could provide. *See* Opinion of ALJ Robinson at 3 (quoting *Insurance Comm'r of State of Maryland v. Equitable Life Assurance Society of the United States,* 339 Md. 596, 613, 664 A.2d 862 (1995)). It is axiomatic that ALJ Robinson was precluded from entering a consent decree without the consent of PGCPS.

When they filed a due process hearing request, the Cavanaghs were principally concerned that PGCPS had allegedly violated the IDEA because it did not have an appropriate nonpublic Intensity V placement for Matthew for the 1998–99 school year by July 17, 1998. *See* Due Process Hearing Request, July 17, 1998. Clearly, however, by the time the parties arrived at the hearing on August 10, 1998, this issue was obviated by the parties when arrangements regarding Matthew's placement at Harbour were confirmed on the morning of August 10, 1998. *See* Tr. II at 16–20.

In *Insurance Commissioner,* evidence was presented at the administrative hearing that was under review that some of the subject gender-based insurance rates and discriminatory practices had been abandoned by the applicant. *See Insurance Commissioner,* 339 Md. 596, 664 A.2d 862, 871. On review, the Court of Appeals found "[i]n light of the uncontradicted facts ... the Insurance Commissioner was fully warranted in finding that the issue regarding the ... insurance policies [were] moot." *Id.*

In this case, ALJ Robinson's decision that the controversy was mooted when the Cavanaghs and PGCPS confirmed the agreement regarding Matthew's placement at Harbour is not dissimilar. After listening to the explanations provided by counsel that the parties had arrived at an agreement which settled the issue of placement for Matthew for the 1998–99 school year, *see* Tr. II at 16–20, and after accepting whatever evidence counsel wished to introduce, *see id.* at 23–28, ALJ Robinson rendered her decision in which she determined that there was no remedy she could

give to the Cavanaghs and concluded the matter was moot. *See* Opinion of ALJ Robinson at 5. After thoroughly reviewing the record, I find that this conclusion was not erroneous, was supported by substantial evidence and was not arbitrary and capricious. *See* Md.Code Ann., State Gov. § 10–222(h)(3) (stating that standard of review is for error, unsupported by substantial evidence, or "arbitrary and capricious"); *see also Insurance Commissioner*, 664 A.2d at 871–72. This conclusion necessitates the finding that the Cavanaghs have failed to generate a genuine issue of material fact with respect to Count I of the 1999 Complaint, *see Anderson*, 477 U.S. at 247, 106 S.Ct. 2505, and therefore summary judgment in favor of PGCPS is appropriate.

    b.   The Cavanaghs would not have been "prevailing parties" under the IDEA even if the ALJ had entered some form of order.

In the alternative, even assuming error on the part of ALJ Robinson in her failure to enter (over PGCPS's objection) an order embodying PGCPS's agreement with Harbour, the Cavanaghs would still not be entitled to "prevailing party" status under the IDEA.

■ A district court may award reasonable attorney's fees under the IDEA "as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B). The term "prevailing party" under the IDEA "connotes the same general meaning . . . under 42 U.S.C. § 1983, and cases interpreting both sections apply the same general principles to determine a plaintiff's entitlement to attorney's fees." *Combs v. School Bd. of Rockingham County*, 15

F.3d 357, 360 (4th Cir.1994); *Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200, 1205 n. 4 (4th Cir.1990). The Fourth Circuit has made clear that "a person may not be a 'prevailing party' plaintiff . . . except by virtue of having obtained an enforceable judgment, consent decree, or settlement giving some of the legal relief sought . . . ." *S–1 v. State Bd. of Educ. of North Carolina*, 21 F.3d 49, 51 (4th Cir.1994) (per curiam).

■ Given that Matthew was ultimately placed at Harbour for the 1998–99 school year, the question remains: Did the Cavanaghs' July 17, 1998, request for a due process hearing lead to Matthew's ultimate placement at Harbour? Based on this record, it is clear that it did not.

On June 30, 1998, PGCPS sent a letter to the Cavanaghs summarizing the decisions made on June 24, 1998, by the County Multidisciplinary Team (CMDT), formerly the Inter–County Admission, Review and Dismissal ("ICARD") team, regarding Matthew's educational placement for the 1998–99 school year. *See* Parents Exhibit 4 at 1. The letter related that the team had decided that Matthew required placement in an Intensity V nonpublic program. *See id.* To accommodate Matthew's needs, the team said that it would send referrals for Matthew to Harbour and SCE. *See id.* The team explained that it had considered the Cavanaghs' request that Matthew be referred to Kennedy Kreiger as a potential placement but "rejected this option . . . because Kennedy Kreiger does not have a high school program." Parents Exhibit 4 at 1; *see also* Tr. II at (relating that PGCPS believed that while Kennedy Kreiger had a transitional program for high school students, it did not have a full high school program).[32]

---

32. The Cavanaghs seek some form of relief based on the assertions (i) that PGCPS was misinformed about whether Kennedy Kreiger had a full time high school program and (ii) that PGCPS referred Matthew to Harbour even after knowing that they had expressed concerns about its capacity to accept students for the 1998–99 school year. At the hearing, the Cavanaghs introduced evidence showing that Kennedy Kreiger did in fact have a full time high school program when PGCPS chose not make a referral to Kennedy Kreiger, *see* Parents Exhibit 1, and that Harbour had sent a letter communicating concerns about its capacity to accept students for the upcoming school year. *See* Parents Exhibit 5. The fact that PGCPS was misinformed about the status of potential referral placements does not trig-

Further, the team advised as follows: "If Matthew's nonpublic placement hasn't been secured by the middle of July, the CMDT Committee will re-convene on July 22, 1998 ... to review the status of Matthew's nonpublic placement options ...." *Id.*

On July 13, 1998, the CMDT committee sent referrals to Harbour and SCE. *See* Parents Exhibits 2 & 3. Four days later, on July 17, 1998, the Cavanaghs filed their due process hearing request. On July 31, 1998, Harbour responded to the PGCPS referral communicating that while it would be an appropriate placement for Matthew, accepting Matthew would negatively affect its student-teacher ratios. *See* Parents Exhibit 7. The record discloses that in the ten days leading up to the hearing, PGCPS and Harbour made arrangements for Matthew to attend Harbour if PGCPS would agree to fund a teacher's assistant to preserve Harbour's student-teacher ratios.

On these facts, I find that it was the normal referral process, rather than the Cavanaghs' due process hearing request, that led to Matthew's placement at Harbour. It is clear to me that the hearing request did not alter the course of Matthew's placement, because by the time of the request PGCPS had already submitted referral packets to potential placements, including Harbour where Matthew ultimately ended up. *See Moncrieffe–Taylor v. Vance,* 945 F.Supp. 106, 108 (D.Md. 1996).

Furthermore, assuming ALJ Robinson had entered an order as the Cavanaghs requested, *Moncrieffe–Taylor* would further indicate that the Cavanaghs would still not be entitled to prevailing party status. Assuming the Cavanaghs had obtained the sought-after order, notwithstanding that order, as in *Moncreiffe–Tay-*

lor, "because the placement process was nearly complete at the date of the hearing, the only way in which the Court could find [Matthew's] placement attributable to ... [counsel's] request for a hearing would be if the Court believed that the impending hearing somehow contributed to the process of finding" a placement for Matthew. *Moncrieffe–Taylor,* 945 F.Supp. at 108. To accept such an argument would be to credit an argument based on the "catalyst theory," a theory that has been squarely rejected by the Fourth Circuit. *See id.; S–1,* 21 F.3d at 51. Accordingly, the Cavanaghs are not entitled to any relief for the 1998–99 school year.

## VI.   CONCLUSION

There can be no doubt that Mr. and Mrs. Cavanagh are as committed as good and loving parents could possibly be to doing all that they can do to ensure that Matthew develops to the full extent of his abilities. For the reasons set forth above, however, I have concluded that the defendant school authorities have not culpably defaulted in the performance of their supportive responsibilties imposed upon them by federal law. Accordingly, judgment in favor of the defendants is ordered.

ger IDEA liability on these facts. If the Cavanaghs are arguing that if PGCPS had had the correct information on Kennedy Kreiger's high school program, Matthew would have been placed there, this argument is entirely speculative and is unsupported by evidence in the record. The Cavanaghs have not particu-

larly alleged, nor have they produced any evidence, moreover, suggesting bad faith or conduct on the part of PGCPS rising to the level of gross misjudgment which would implicate Section 504 of the Rehabilitation Act. *See Sellers v. School Bd. of the City of Manassas,* 141 F.3d 524, 528 (4th Cir.1998).